1   ROBBINS GELLER RUDMAN
       & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    Post Montgomery Center
3   One Montgomery Street, Suite 1800
    San Francisco, CA  94104
4   Telephone:  415/288-4545
    shawnw@rgrdlaw.com
5           – and –
    DARREN J. ROBBINS (168593)
6   A. RICK ATWOOD, JR. (156529)
    LUKE O. BROOKS (212802)
7   J. MARCO JANOSKI GRAY (306547)
    655 West Broadway, Suite 1900
8   San Diego, CA  92101-8498
    Telephone:  619/231-1058
9   darrenr@rgrdlaw.com
    ricka@rgrdlaw.com
10  lbrooks@rgrdlaw.com
    mjanoski@rgrdlaw.com
11
    Attorneys for Plaintiffs
12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIAA-CREF INVESTMENT MANAGEMENT, LLC, TEACHERS ADVISORS, LLC, NUVEEN FUND ADVISORS, LLC, NUVEEN EQUITY INDEX FUND (f/k/a TIAA-CREF EQUITY INDEX FUND), NUVEEN LARGE CAP GROWTH INDEX FUND (f/k/a TIAA-CREF LARGE-CAP GROWTH INDEX FUND), NUVEEN LARGE CAP GROWTH FUND (f/k/a TIAA-CREF LARGE-CAP GROWTH FUND), NUVEEN MID CAP GROWTH FUND (f/k/a TIAA-CREF MID-CAP GROWTH FUND), NUVEEN LIFE STOCK INDEX FUND (f/k/a TIAA-CREF LIFE STOCK INDEX FUND), NUVEEN LIFE GROWTH EQUITY FUND (f/k/a TIAA-CREF LIFE GROWTH EQUITY FUND), TIAA SEPARATE ACCOUNT VA-1, CREF GLOBAL EQUITIES ACCOUNT, | Case No.    3:24-cv-06749<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| [Caption continued on following page.] | DEMAND FOR JURY TRIAL |

1  CREF EQUITY INDEX ACCOUNT, CREF )
   STOCK ACCOUNT, CREF GROWTH     )
2  ACCOUNT, NUVEEN MID CAP GROWTH )
   OPPORTUNITIES FUND, and NUVEEN )
3  S&P 500 DYNAMIC OVERWRITE FUND, )
                                   )
4                   Plaintiffs,    )
                                   )
5        vs.                       )
                                   )
6  DOCUSIGN, INC., DANIEL D. SPRINGER, )
   MICHAEL J. SHERIDAN, CYNTHIA    )
7  GAYLOR, and LOREN ALHADEFF,     )
                                   )
8                   Defendants.    )
                                   )
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION AND SUMMARY OF ALLEGATIONS ...........................................1

II.     JURISDICTION AND VENUE ..................................................................................6

III.    PARTIES .....................................................................................................................7

IV.     BACKGROUND ..........................................................................................................9

      A.     DocuSign's eSignature Business ...................................................................9

      B.     The COVID-19 Pandemic Creates a Dramatic Spike in Demand for DocuSign's eSignature Products.................................................................10

      C.     Former Employees Confirm that Defendants Were Aware that DocuSign's COVID-19-Induced Boom Was Unsustainable......................................14

V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...............................................................................................................30

      A.     In June 2020, Defendants Began Claiming that DocuSign's New COVID-19-Related Customers Would Not Return to Manual Signature Processes After the Pandemic – Despite Internal Red Flags to the Contrary .....................30

      B.     In September 2020, Defendants Continued to Misleadingly Claim that COVID-19-Induced Growth Would Continue Beyond the Pandemic .................35

      C.     Despite Declining Usage Rates, in December 2020 and January 2021 Defendants Continued to Deny that COVID-19-Related Customers Would Go Back to Pen and Paper ..........................................................................37

      D.     Defendants Concealed Worsening Demand Trends and Renewal Rates in Early 2021, and Continued to Claim in March 2021 that Its Customers Do Not Leave ...................................................................................................40

      E.     While Demand Trends Worsened Further, in June 2021 Defendants Continued the False and Misleading Drumbeat that Customers "Simply Don't Go Back" ...................................................................................................44

      F.     Defendants Falsely Claimed in September 2021 that They Were Seeing No Difference in Customer Churn.........................................................................47

      G.     Even as the Truth Gradually Emerged in December 2021 and March 2022, Defendants Continued to Deny Reality ......................................................49

VI.     ADDITIONAL SCIENTER ALLEGATIONS.............................................................50

      A.     The Individual Defendants Had Actual Knowledge of or Recklessly Disregarded DocuSign's Internal Metrics Showing Waning Demand .................50

      B.     Defendants' Insider Stock Sales and Favorable Debt Offering Further Buttress the Strong Inference of Scienter ......................................................53

Page

C.   The Fraud Involved Demand and Growth Trends for DocuSign's Flagship
eSignature Product – *i.e.*, Its Core Operations ........................................................55

D.   High-Level Executive Departures and the Reorganization of DocuSign's
Leadership Provide Further Evidence of Scienter ................................................55

VII.   LOSS CAUSATION ...............................................................................................................57

A.   December 2021 Loss Event ..............................................................................58

B.   March 2022 Loss Event ....................................................................................60

C.   June 2022 Loss Event .......................................................................................62

VIII.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE ..........................................64

COUNT I ...................................................................................................................................65

For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated
Thereunder Against All Defendants ..............................................................................65

COUNT II ..................................................................................................................................67

For Violation of §20(a) of the Exchange Act Against All Defendants..............................67

COUNT III .................................................................................................................................68

For Violation of §20A of the Exchange Act Against Defendants Springer, Gaylor,
and Alhadeff.....................................................................................................................68

PRAYER FOR RELIEF ............................................................................................................69

JURY DEMAND ........................................................................................................................69

1    Plaintiffs,[1] by and through their counsel Robbins Geller Rudman & Dowd LLP ("Counsel"),
2  allege the following upon personal knowledge as to themselves and their own acts, and upon
3  information and belief as to all other matters.[2]

4  **I.    INTRODUCTION AND SUMMARY OF ALLEGATIONS**

5    1.    Plaintiffs bring this action pursuant to the Securities Exchange Act of 1934
6  ("Exchange Act") against DocuSign and four of the Company's former top executives to recover
7  damages for losses Plaintiffs suffered in connection with their purchases of DocuSign common stock
8  between June 4, 2020 and June 9, 2022 (the "Relevant Period").  Plaintiffs purchased DocuSign
9  common stock at artificially inflated prices during the Relevant Period and suffered damages as a
10 result of the violations of the securities laws alleged herein.

11   2.    Plaintiffs assert violations of §§10(b), 20(a), and 20A of the Exchange Act, and Rule
12 10b-5 promulgated thereunder, against Defendants DocuSign and its former Chief Executive Officer
13 ("CEO") Daniel D. Springer, former Chief Financial Officers ("CFOs") Michael J. Sheridan and
14 Cynthia Gaylor, and former Chief Revenue Officer ("CRO") Loren Alhadeff.[3]

15

16

17 _____

[1]    "Plaintiffs" refers collectively to: (a) TIAA-CREF Investment Management, LLC; (b) Teachers Advisors, LLC; (c) Nuveen Fund Advisors, LLC; (d) Nuveen Equity Index Fund (f/k/a TIAA-CREF Equity Index Fund); (e) Nuveen Large Cap Growth Index Fund (f/k/a TIAA-CREF Large-Cap Growth Index Fund); (f) Nuveen Large Cap Growth Fund (f/k/a TIAA-CREF Large-Cap Growth Fund); (g) Nuveen Mid Cap Growth Fund (f/k/a TIAA-CREF Mid-Cap Growth Fund); (h) Nuveen Life Stock Index Fund (f/k/a TIAA-CREF Life Stock Index Fund); (i) Nuveen Life Growth Equity Fund (f/k/a TIAA-CREF Life Growth Equity Fund); (j) TIAA Separate Account VA-1; (k) CREF Global Equities Account; (l) CREF Equity Index Account; (m) CREF Stock Account; (n) CREF Growth Account; (o) Nuveen Mid Cap Growth Opportunities Fund; and (p) Nuveen S&P 500 Dynamic Overwrite Fund.

[2]    Plaintiffs' information and belief is based on, among other things, the independent investigation of Counsel, which includes, but is not limited to, a review and analysis of: (a) DocuSign, Inc. ("DocuSign" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) transcripts of DocuSign senior management's conference calls with investors and analysts; (c) releases and media reports issued about and disseminated by the Company; (d) analyst reports issued about DocuSign; (e) other public information and data regarding the Company; (f) interviews with former DocuSign employees; (g) allegations set forth in the ongoing class action litigation, *Weston v. DocuSign, Inc.*, No. 3:22-cv-00824-WHO (N.D. Cal.), and conversations with class counsel; and (h) documents cited herein. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

[3]    "Defendants" and "Individual Defendants" are defined *infra*, §III.

3.      This case arises from Defendants' false and misleading statements and omissions regarding the sustainability of the unprecedented spike in demand for DocuSign products caused by the COVID-19 pandemic.  Throughout the Relevant Period, Defendants misled the market and concealed from investors that the Company's accelerated growth in 2020 and early 2021 was attributable to an unsustainable increase in short-term, one-off COVID-19-driven contracts – rather than a sustainable shift in demand that they repeatedly touted to the market.  Defendants' misrepresentations and omissions caused the price of DocuSign common stock to trade at artificially inflated levels throughout the Relevant Period.  When the truth about DocuSign's financial condition and operations began to reach the market through a series of disclosures beginning in December 2021, the price of the Company's common stock fell significantly, causing damage to Plaintiffs.

4.      DocuSign is a software company based in San Francisco, California that specializes in electronic signature ("eSignature") products that allow customers to sign and send documents electronically.  Since its founding, subscriptions to the Company's key "DocuSign eSignature" product have accounted for the substantial majority of DocuSign's revenues.

5.      With the onset of the COVID-19 pandemic in early 2020, internet-based technologies such as DocuSign's eSignature products became key resources as businesses shifted to remote work environments.  For this reason, between March 2020 (the month the World Health Organization declared COVID-19 a global pandemic) and June 2020 (the start of the Relevant Period), DocuSign experienced unprecedented sales and billings growth as a result of pandemic-driven demand.  Indeed, for its fiscal quarters ending April 2020 and July 2020, the Company reported total billings of more than $342 million and $406 million, respectively – which amounted to unprecedented year-over-year ("YoY") increases of 59% and 61%.  Unbeknownst to investors, however, Defendants were made aware of numerous internal red flags throughout the first half of 2020 indicating that this COVID-19-fueled growth was unsustainable.  Such red flags included, *inter alia*, that customers who subscribed to eSignature after the start of the COVID-19 pandemic: (i) told DocuSign employees that they would not renew their contracts once they were able to return to the office; (ii) contracted for specific COVID-19-related use cases that would not recur after the pandemic

1    ended; (iii) were not using the full capacity of their DocuSign subscriptions; and/or (iv) refused to

2    enter into longer-term three-year contracts and instead opted for one-year contracts.

3        6.    Nevertheless, beginning in June 2020, DocuSign executives repeatedly assured

4    investors that the Company's supercharged, pandemic-driven growth was sustainable because

5    historical customer retention rates indicated that customers do not "go back to pen and paper" once

6    they have transitioned to eSignature.  In other words, DocuSign used pre-pandemic data as a guide

7    for forecasting future growth and retention rates – even though the Company had clear evidence that

8    the behavior of pre-pandemic customers was an unreliable basis to determine whether DocuSign

9    would be able to retain pandemic customers at the same rate.  For example, on DocuSign's June 4,

10   2020 earnings call, then-CEO Daniel Springer stated that "even when the COVID-19 situation is

11   behind us, we don't anticipate customers returning to paper or manual-based processes.  Once they

12   take their first digital transformation steps with us and they realize the time, cost and customer

13   experience benefits, they rarely go back."  During the same call, then-CFO Michael Sheridan stated

14   that onetime COVID-19 use cases were "the extreme minority."  Sheridan also stated that: "[W]e

15   also believe that these customers will remain with us" and that DocuSign's "situation is [not]

16   analogous to Zoom" (who had declined to raise their guidance due to the uncertainty of post-

17   pandemic demand) because "[w]e think [the 'churn' of customers is] going to remain pretty stable

18   because we think that the value propositions, again, we're delivering are sustainable, whether it's a

19   work-from-home environment or not."

20       7.    Defendants repeated this mantra throughout the remainder of 2020, stating again and

21   again that "it's very rare to see anyone go back to paper" and that the dramatic rise in sales the

22   Company saw at the outset of the COVID-19 pandemic would "be sustained even after things return

23   to whatever normal looks like in the future. . . .  [W]e don't see trends that things are going to return

24   to the way they looked and trended pre-COVID."  In reality, however, many customers informed

25   DocuSign employees in early 2020 that they intended to revert to manual signature processes after

26   the COVID-19 lockdowns ended and opted for short-term one-year contracts – and demand for

27   eSignature began to wane in the fall of 2020 as states lifted their stay-at-home orders and COVID-19

28   vaccines became available.  Despite the fact that DocuSign relied on data about pre-pandemic

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                - 3 -

customers in assuring investors of the retention of DocuSign's new pandemic customers, the Company did in fact track metrics for these customers separately. DocuSign employees reported lower product usage rates for pandemic customers compared to pre-pandemic customers – confirming that the pandemic customers would not be renewing their contracts. By February 2021, internal analyses showed that both product usage and customer retention rates were declining. DocuSign was missing its consumption targets, and senior management began micromanaging sales data in Salesforce.

8.      Yet, even though Defendants were aware that DocuSign was experiencing decelerating demand, between December 2020 and April 2021, Defendants continued to deny adverse sales trends. For example, during a December 3, 2020 earnings call, Springer confirmed that "[w]hen customers go from paper-based processes to digital agreement processes, they do not go back," and "that trend will hold when the pandemic subsides." Then-CFO Cynthia Gaylor similarly reassured investors that DocuSign's value remained strong "whether customers began using our product before or after the pandemic began," adding: "We don't see customers going back to pen and paper." When asked explicitly, Springer denied that the demand for DocuSign's eSignature products had been "pulled forward" by the pandemic, such that demand in later quarters would decrease, saying: "[W]e've accelerated that growth not because we're sort of robbing from the future, but we're just getting closer towards that $25 billion TAM opportunity." Defendants maintained this position, repeatedly asserting in January and March 2021 that customers "don't tend to go back" and that the Company's upward billing trend "is not a short-term thing. This is not something that just sort of happened because of the pandemic. [W]e believe it's going to continue to happen for years."

9.      By the summer of 2021, however, vaccines had become widely available and most states had completely lifted their stay-at-home orders. Customers returned to the office, their one-year contracts ended, and COVID-19-specific uses dissipated – causing demand for eSignature to further weaken. Defendants were well aware that the Company's metrics showed declining usage and retention rates, yet they continued to publicly deny adverse sales trends. For instance, during DocuSign's June 3, 2021 earnings call, Springer again claimed, *inter alia*, that "once businesses

[digitally] transform their agreement processes, they simply don't go back.  We believe this trend will only accelerate as the anywhere-economy continues to emerge."  And again in September 2021, Springer claimed that DocuSign would become the "new normal" for customers who first subscribed to eSignature during the pandemic, and that Defendants did not "see them going back to pen and paper."

10.     Defendants' statements and omissions had their intended effect.  Whereas the price of DocuSign common stock traded between $40 and $75 per share during 2019 (and approached $140 per share by June 2020), during the Relevant Period the stock price dramatically increased to all-time highs and traded at inflated levels up to and exceeding $300 per share.  Defendants took advantage of the artificial inflation in DocuSign's share price, with **Springer, Gaylor, and Alhadeff selling more than $193 million of DocuSign stock at prices as high as $310 per share** during the Relevant Period.  Springer alone sold over $81 million of stock on February 1, 2021 – his largest insider sale ever.  And in mid-January 2021, the Company itself took advantage of its inflated valuation to sell $690 million worth of convertible bonds and enter into a $500 million revolving credit facility on favorable terms.

11.     The Individual Defendants (*i.e.*, DocuSign's highest-ranking corporate officers) were each directly involved in the Company's financial forecasts and kept apprised of the key metrics at issue in this case.  Indeed, numerous former DocuSign employees confirm that the Individual Defendants had access to and monitored customer sales data in the Company's Salesforce and Snowflake databases, which showed that customers who subscribed to DocuSign during the COVID-19 pandemic used the Company's eSignature product and renewed their subscriptions at a far lower rate than pre-pandemic customers.  These witness accounts are further corroborated by Defendants' own statements acknowledging that they closely tracked customer demand data.

12.     The relevant truth concerning DocuSign's reliance on COVID-19-induced growth first began to reach the market in December 2021 and continued to leak out thereafter, as the Company disclosed three consecutive quarters of substantial decreases in its billings growth rate as the pandemic receded and customer demand waned.  First, on December 2, 2021, Defendants disclosed its YoY billings growth rate had declined by more than half – from a growth rate of 59%

when the pandemic began to just 28% for the fiscal quarter ending October 2021.  Thereafter on March 10, 2022, Defendants revealed the growth rate had fallen to just 25%, before revealing on June 9, 2022 that DocuSign's growth rate was a mere 16%.  DocuSign's stock price dropped significantly and dramatically on each of these announcements to settle at just over $65 per share by the end of the Relevant Period – an 80% decline from its Relevant Period high.



## II.   JURISDICTION AND VENUE

13.   The claims alleged herein arise under §§10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§78j(b), 78t(a), and 78t-1), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14.   This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

15.     Venue is proper in this District pursuant to §27 of the Exchange Act and §28 U.S.C. §1391(b).  DocuSign's headquarters were located within this District during the Relevant Period, the statements issued by Defendants alleged herein to be actionable were prepared and reviewed in and disseminated from this District, and Defendants conducted substantial economic activity in this District.  As such, substantial acts in furtherance of the alleged misconduct have occurred in this District.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**III.    PARTIES**

17.     Plaintiffs Nuveen Equity Index Fund (f/k/a TIAA-CREF Equity Index Fund), Nuveen Large Cap Growth Index Fund (f/k/a TIAA-CREF Large-Cap Growth Index Fund), Nuveen Large Cap Growth Fund (f/k/a TIAA-CREF Large-Cap Growth Fund), Nuveen Mid Cap Growth Fund (f/k/a TIAA-CREF Mid-Cap Growth Fund), Nuveen Life Stock Index Fund (f/k/a TIAA-CREF Life Stock Index Fund), Nuveen Life Growth Equity Fund (f/k/a TIAA-CREF Life Growth Equity Fund), TIAA Separate Account VA-1, CREF Global Equities Account, CREF Equity Index Account, CREF Stock Account, CREF Growth Account, Nuveen Mid Cap Growth Opportunities Fund, and Nuveen S&P 500 Dynamic Overwrite Fund are all funds and/or accounts managed by Plaintiffs TIAA-CREF Investment Management, LLC, Teachers Advisors, LLC, and/or Nuveen Fund Advisors, LLC.  Each purchased DocuSign common stock at artificially inflated prices during the Relevant Period and suffered damages as a result of the violations of the Exchange Act alleged herein.

18.     Defendant DocuSign is a publicly traded technology company incorporated under the laws of Delaware and headquartered in San Francisco, California.  DocuSign was founded in 2003 and holds itself out as the global leader in eSignature products.  The Company filed for an initial public offering and went public in April 2018, and its common stock trades on the NASDAQ under the trading symbol "DOCU."

19.     Defendant Daniel D. Springer ("Springer") served as DocuSign's CEO from January 2017 to June 2022, and has served as a member of the Company's Board of Directors (the "Board")

1    since January 2017.   During the Relevant Period, Springer sold 722,830 shares of DocuSign

2    common stock at artificially inflated prices as high as $267 per share for proceeds of more than $154

3    million.

4         20.    Defendant Michael J. Sheridan ("Sheridan") served as DocuSign's CFO from August

5    2015 to September 2020, and thereafter served as the Company's President of International from

6    September 2020 to November 2021.

7         21.    Defendant Cynthia Gaylor ("Gaylor") served as DocuSign's CFO from September

8    2020 to June 2023.   During the Relevant Period, Gaylor sold 16,555 shares of DocuSign common

9    stock at artificially inflated prices as high as $310 per share for proceeds of more than $3.8 million.

10        22.    Defendant Loren Alhadeff ("Alhadeff") served as DocuSign's CRO from February

11   2019 to March 2022.   During the Relevant Period, Alhadeff sold 151,882 shares of DocuSign

12   common stock at artificially inflated prices as high as $308 per share for proceeds of more than

13   $34.9 million.

14        23.    Defendants Springer, Sheridan, Gaylor, and Alhadeff are collectively referred to

15   herein as the "Individual Defendants."   The Individual Defendants and DocuSign are collectively

16   referred to herein as "Defendants."

17        24.    The Individual Defendants, because of their positions with the Company, possessed

18   the power and authority to control the contents of DocuSign's quarterly reports, shareholder letters,

19   releases, and presentations to securities analysts, money and portfolio managers, and institutional

20   investors, *i.e.*, the market.   The Individual Defendants were provided with copies of DocuSign's

21   reports and press releases alleged herein to be misleading prior to or shortly after their issuance and

22   approved or ratified the statements therein and/or had the ability and opportunity to prevent their

23   issuance or cause them to be corrected.   Because of their positions with the Company, their direct

24   participation in the management of the Company, their direct involvement in the day-to-day

25   operations of the Company and their access to material, nonpublic information available to them, the

26   Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not

27   been disclosed to and were being concealed from the public, and knew or recklessly disregarded that

28   the positive representations being made were then materially false.

1

## IV. BACKGROUND

2

### A. DocuSign's eSignature Business

3    25.    Founded in 2003, DocuSign was the first company to bring to market a successful

4    eSignature software product, which allows customers to sign and send documents electronically.

5    DocuSign offers access to its software platform on a subscription basis, and its subscriptions

6    typically range from one to three years.  Pricing on DocuSign subscriptions varies based on the

7    number of users within an organization, the functionality a customer requires, and the number of

8    digital "Envelopes" provided.  DocuSign's Envelopes are digital containers used to send one or more

9    documents for signature or approval to one or more recipients.  If a customer uses all of their

10   purchased Envelopes, but still has time remaining on their subscription, they must purchase more

11   Envelopes in order to continue utilizing the eSignature software.

12   26.    Since its founding, DocuSign's eSignature subscriptions have been the single largest

13   contributor to the Company's revenue.  As reported in its Annual Reports, DocuSign "generate[s]

14   substantially all [its] revenue from sales of subscriptions," which accounted for 94% to 97% of the

15   Company's annual revenues from February 1, 2019 through January 31, 2023.[4]  DocuSign's

16   remaining revenues are derived from professional and other non-subscription services, which

17   primarily consist of providing new customers with software deployment and integration services.  As

18   the Company disclosed in those same Forms 10-K for fiscal years 2020-2023: "***Sales of***

19   ***subscriptions to our e-signature solutions account for substantially all of our subscription revenue***

20   ***and are the source of substantially all of our professional services revenue***."

21   27.    While DocuSign had reported substantial revenue in its time as a public company, it

22   had never been profitable, but rather experienced net losses every year from inception through the

23   end of the Relevant Period.  Prior to the start of the Relevant Period, the Company reported annual

24   net losses of $426.5 million and $208.4 million for fiscal years 2019 and 2020, respectively.  For this

25

26   _____

[4]    DocuSign's fiscal year begins on February 1 and ends on January 31 (with fiscal quarters
27   ending on April 30, July 31, and October 31), and the Company identifies each fiscal year based on
     the year in January in which the fiscal year ends.  DocuSign's fiscal year 2020 thus began on
28   February 1, 2019 and ended on January 31, 2020.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                                    - 9 -

reason, the Company repeatedly acknowledged in its Forms 10-K that it would "need to generate and sustain increased revenue levels in future periods to become profitable."

**B.      The COVID-19 Pandemic Creates a Dramatic Spike in Demand for DocuSign's eSignature Products**

28.      In January and February 2020, both the World Health Organization ("WHO") and the United States government declared public health emergencies due to the onset and spread of confirmed cases of the COVID-19 virus.  On March 11, 2020, the WHO declared COVID-19 a global pandemic, and two days later the United States government followed suit by declaring a national emergency.  By April 2020, it is estimated that approximately half of the world's population was subject to stay-at-home lockdown orders as more than 90 countries recommended or ordered confinements, curfews, and quarantines in order to prevent the spread of the virus.

29.      As a result of these measures, in spring 2020 nearly every business in the United States made a drastic shift to a remote work-from-home environment – making internet-based technologies like Zoom (video conferencing), Slack (instant messaging), and DocuSign (electronic signatures) essential products.  Given the concern at the time that the COVID-19 virus could survive and be transmitted on all types of surfaces, businesses that traditionally relied on signing and/or mailing hard-copy documents had to quickly transition to electronic signatures.  Demand for DocuSign's eSignature products accordingly began to skyrocket in March 2020, and the Company grew at unprecedented levels throughout the Relevant Period – as reflected in the unprecedented elevated growth rates for DocuSign's reported revenues and "billings" during this time.

30.      **Revenue**.  DocuSign recognizes revenue over the terms of its subscription contracts, whereby much of its reported quarterly revenue is generated from the recognition of revenue from contracts entered into during prior reporting periods.  Thus, any upturn or downturn in sales is not immediately reflected in full in the Company's current revenue.  Indeed, as DocuSign acknowledged in its SEC filings, "a shortfall in demand for [its] products and solutions and professional services or a decline in new or renewed contracts in any one quarter may not significantly reduce [its] revenue for that quarter but could negatively affect [its] revenue in future quarters."

31.    DocuSign's reported revenue sequentially grew each quarter in calendar years 2020 and 2021:



32.    However, the rate at which this revenue grew (*i.e.*, the Company's YoY revenue growth rate) began to significantly spike in the fiscal quarter ending July 2020 – as DocuSign began recognizing revenue from new contracts driven by COVID-19-related shutdowns – before starting a steady deceleration in late 2021:

1
2
3
4
5
6
7
8
9
10
11
12



13    33.    **Billings**.  Whereas reported revenue is recognized over the term of a contract,

14  DocuSign's "billings" metric measures current period sales.  As explained in the Company's SEC

15  filings, billings is the key non-GAAP financial metric that DocuSign uses to track and "measure [its]

16  periodic performance."   The metric is calculated as "total revenues plus the change in contract

17  liabilities and refund liability less contract assets and unbilled accounts receivable in a given period."

18  The metric reflects sales to new customers plus subscription renewals and additional sales to existing

19  customers, and the Company uses billings to measure and monitor its ability to provide its business

20  with the working capital generated by upfront payments from customers.

21    34.    DocuSign's billings grew throughout calendar years 2020 and 2021:

22
23
24
25
26
27
28





35.     The rate at which the Company's billings grew (*i.e.*, the YoY billings growth rate) significantly spiked in the fiscal quarter ended April 2020 – as the COVID-19 pandemic forced businesses to sign up for remote solutions like DocuSign's eSignature products – before starting a dramatic sequential decline in late 2021:



36. With each quarterly earnings release, DocuSign provided billings guidance to the market to advise investors of how much it expected its billings to grow or decline over the next fiscal quarter and remaining fiscal year. As a result of the COVID-19-induced spike in demand the Company received in early 2020, from June 2020 until December 2021 DocuSign consistently provided increased billings guidance each quarter.

37. Notably, whereas DocuSign took advantage of its early COVID-19-related demand to issue increased billings guidance, other remote technology companies like Zoom and Slack tempered their guidance due to the uncertainties of the pandemic. For instance, in connection with Zoom's June 2020 earnings results, Zoom did not substantially raise its guidance even though it was experiencing record growth – due to uncertainties regarding the pandemic. As Zoom's CFO explained on its June 2, 2020 earnings call, "[t]he COVID-19 pandemic adds an unprecedented new variable to our business model where historical knowledge may no longer apply." Slack similarly withdrew its fiscal year 2021 billings guidance in June 2020 – all while experiencing higher-than-expected earnings and revenue – due to "ongoing uncertainties surrounding the COVID-19 pandemic."

## C. Former Employees Confirm that Defendants Were Aware that DocuSign's COVID-19-Induced Boom Was Unsustainable

38. Several former DocuSign employees have provided information confirming that Defendants' statements issued during the Relevant Period regarding the sustainability of the Company's COVID-19-induced demand were false and misleading when made, and that Defendants knew or recklessly disregarded the falsity or misleading nature of their statements. These former employees ("FEs") include individuals formerly employed at DocuSign during the Relevant Period, whose accounts corroborate one another, Defendants' admissions, and the additional facts alleged herein. The witnesses are described by job description and responsibility, and duration of employment, confirming their reliability and personal knowledge.[5]

---

[5] To maintain their anonymity, all of the former employees are described herein with feminine pronouns regardless of their gender.

39.     **Former Employee 1 ("FE 1")** was employed by DocuSign from April 2021 to July 2023 as an Account Executive in the Real Estate and Construction Group, and worked in the Chicago, Illinois area.  FE 1 reported directly to Regional Vice President ("RVP") Joe Martino, who in turn reported to Area Vice President ("AVP") Paul Fox, who reported to the President of Sales, who reported to the CRO.

40.     According to FE 1, many companies were opening accounts during the COVID-19 pandemic because of business shutdowns and employees being forced to work from home. However, FE 1 knew that that her business accounts would not be sustainable and that once COVID-19 subsided most of her accounts were not going to renew.  In FE 1's view, there was "not enough wind in the sails" and the Company did not plan accordingly.

41.     FE 1 estimated that 70% of her smaller accounts were only signing contracts for one-year deals during the pandemic, as clients did not want to invest in three-year deals when there were still questions regarding the effect and duration of the COVID-19 pandemic.  FE 1 heard from tenured Account Representatives that they previously were able to sell more three-year contracts prior to the pandemic.  Once the pandemic subsided and employees went back to the office, companies did not need as many Envelopes to conduct their business, causing most of FE 1's accounts either to not renew their subscriptions or renew at much lower amounts. FE 1 further stated that there was a high churn rate for most of her accounts.  Her clients told her there was no need for them to renew their accounts, and it was difficult for her to achieve sales numbers and quotas.

42.     According to FE 1, DocuSign tracked all accounts and sales information in Salesforce.  Salesforce was a single source of truth that tracked opportunities and account notes, and management had access to Salesforce and all account information.  FE 1 explained that there were drop-down tabs in the Salesforce program that documented the churn rates, why the accounts churned, and the amount of churn.  There were additional drop-down flags for selections, such as product too expensive, customer went to competitor, or no longer needed after the COVID-19 pandemic. FE 1 could also keep track of COVID-19-related versus non-COVID-19-related contracts for her accounts.

43.     **Former Employee 2 ("FE 2")** was employed by DocuSign from September 2018 to September 2021, with her most recent title being Senior Enterprise Market Development in the Telecommunications, Media & Utilities segment.  FE 2 reported directly to Vice President ("VP") Head of Industries Michael Jackson, who in turn reported the Director of Market Development Drew Bruecken.  Bruecken in turn reported to the President of Sales, who reported to the CRO.  As part of the Market Development team, FE 2 was responsible for tracking down new leads, cold calling customers, and opening new accounts.

44.     According to FE 2, once the COVID-19 pandemic started, there was a record number of new accounts opening throughout every vertical in DocuSign.  Even so, it was very difficult for FE 2 to sell three-year contracts, and the most common accounts she sold were one-year contracts.

45.     In early 2021, FE 2 observed that Small Medium Business ("SMB") accounts were starting to churn and companies were not renewing expiring contracts, and FE 2 indicated that the SMB segment was hit the hardest by accounts churning after the COVID-19 pandemic subsided.

46.     FE 2 ultimately left DocuSign in September 2021 because she started to observe changes with her accounts.  Some of her accounts churned prior to her departure, and she did not have a positive outlook of the prospective market.  While FE 2 did not know precisely how many accounts churned at the Company, she was advised by her colleagues that they were not hitting their sales quotas.  In FE 2's view, DocuSign oversold every account they could during the COVID-19 pandemic, and during the pandemic sales representatives were overselling Envelopes.  When contracts came up for renewal a year later, companies were signing for less or discontinuing their contracts.  FE 2 believed DocuSign's senior executives placed unrealistic expectations at the Company, as they were forecasting their numbers based on COVID-19-related accounts and knew such accounts were going to churn, and that the COVID-19-related numbers were not sustainable.

47.     FE 2 confirmed that all accounts and sales information were tracked in Salesforce by executives at DocuSign, as management had access to all account information in Salesforce.  Salesforce served as the source of truth for tracking sales and opportunities for the Company, and executives were able to pull parameter reports from Salesforce that tracked deals that were lost in 2020 and 2021.

48.     **Former Employee 3 ("FE 3")** was employed by DocuSign from January 2018 to May 2022, with her most recent title being Senior Channel Manager, North America.  FE 3 reported directly to Derek Nowak, the Senior Director of Business Development and Channel Sales.  Nowak in turn reported directly to Scott Owen, Senior Managing Director, Global Strategic Alliances, who then reported to Christopher Rimer, VP, Global Partner Ecosystem.  As a Senior Channel Manager, FE 3 was responsible for Mexico, America, and Canada and covered every sector, industry, and concentration throughout the Company, and was also tasked with training SMB and Enterprise Associates throughout the Company on the business sales model.

49.     According to FE 3, at the start of the COVID-19 pandemic there was a record number of new account openings at DocuSign.  During this time period, FE 3 was working 18 to 20 hours per day covering all "verticals"[6] throughout the Company to include Europe and Asia.  FE 3 described this as the busiest time of her life and the majority of the accounts opened were because of the pandemic.  The majority of the COVID-19-related accounts were only signed for one-year contracts.

50.     According to FE 3, DocuSign had two distinct selling motions.  The NewCo Team was responsible for bringing in new logos, opportunities, business, and revenue into the Company.  The Up Sell Team was responsible for managing, expanding, and upselling those accounts.

51.     According to FE 3, towards the end of the COVID-19 pandemic, customers who purchased DocuSign products out of fear were no longer willing to pay a premium for the same products that they purchased at the height of the pandemic when companies did not know when the pandemic was going to end.  FE 3 explained that the SMB segment at DocuSign was hit the hardest – as DocuSign products contained workflows that are more advanced and not all SMB clients utilized all of the functions.  Such companies used only a fraction of what they purchased and were not renewing their contracts for a product they were not using.  FE 3 estimated that 50% of the COVID-19-related accounts churned after the restrictions eased and the pandemic diminished.  Once

---

[6]     As described in the Company's SEC filings, DocuSign organizes its sales employees by "industry verticals," which include "real estate, financial services, insurance, health care and life sciences, government, higher education, communications, retail, manufacturing, nonprofits and more."

1   employees went back to the office, companies did not need as many Envelopes to conduct their

2   business.  Most of her accounts were not renewing or renewing at much lower levels.

3       52.   FE 3 also confirmed that DocuSign tracked all accounts and sales information in

4   Salesforce, and that all upper-level executives in her reporting line had clear visibility to data and

5   had full access into Salesforce and account information.  FE 3 further explained that there were drop-

6   down tabs in the Salesforce program that tracked churn rates and the reason the accounts churned.

7   There were additional drop-down flags for selections in the notes tab, such as product too expensive,

8   customer went to competitor, or no longer needed after the COVID-19 pandemic.

9       53.   These former employee accounts are further supported by the accounts of former

10  DocuSign employees cited in the amended class action complaint filed in the ongoing class action

11  litigation *Weston v. DocuSign, Inc.*, No. 3:22-cv-00824-WHO (N.D. Cal.) ("Class CWs"), which

12  were credited by the court in denying Defendants' motion to dismiss the class complaint, and

13  corroborate the accounts described above, Defendants' admissions, and other facts alleged herein.

14      54.   **Confidential Witness 1 ("Class CW 1")** was employed by DocuSign from

15  November 2020 through November 2021 as a Principal Analyst in the Sales and Business

16  Intelligence groups.  As part of her role as a Principal Analyst, Class CW 1 evaluated which

17  professional or educational services first-time or renewing DocuSign customers might require.  Class

18  CW 1 also reviewed metrics, including customer usage data, which was tracked separately and

19  linked to Salesforce, after the data had been passed through, or "'scrubbed,'" by the product teams.

20  Class CW 1 accessed all this data through spreadsheets and, later, through a data warehouse tool

21  called Snowflake – which is a repository for all the Company's data, including that which was stored

22  in Salesforce.  According to Class CW 1, Snowflake was used for data storage and a tool to conduct

23  data analysis.  Through Snowflake, she could track different key performance indicators ("KPIs")

24  and other metrics.  According to Class CW 1, the C-Suite would have seen information derived from

25  Snowflake and converted into reports or slide decks for their consumption.

26      55.   As part of her job duties, Class CW 1 also looked at future forecasting for new and

27  renewal sales in order to forecast what professional or educational services the businesses would

28  need going forward and how to calibrate that on the services side in order to ease the integration of

1    DocuSign software into customers' systems.  In other words, Class CW 1 specifically reviewed

2    whether or not DocuSign's licenses pipeline was healthy enough to support Professional Services

3    targets.  According to Class CW 1, through Snowflake she had insight into metrics for the entire

4    Company and for all products.  Class CW 1 had access to and regularly viewed all global customer

5    product usage data, sales data, and pipeline information from all of DocuSign's channels – all of

6    which metrics DocuSign used to forecast customer renewals and churn based on historical trends.

7    Class CW 1 was also responsible for preparing slide decks for monthly and quarterly business

8    review meetings ("MBR" and "QBR," respectively), which were attended by her director Anshul

9    Saxena, as well as VP of Global Success Operations Jeremy Scheffel and SVP of Customer Success

10   Lambert Walsh.  Throughout her tenure at the Company, Class CW 1 was on monthly or quarterly

11   video conference calls, or town hall meetings, held by DocuSign CEO Springer and other C-Suite

12   members.

13        56.    According to Class CW 1, through the Salesforce and Snowflake databases,

14   Defendants were able to specifically track the differences between customers who purchased

15   DocuSign before and during the pandemic.  From the time she started at DocuSign in November

16   2020, the Company actively tracked pre-COVID-19 customers separately from customers who

17   signed on to DocuSign during the COVID-19 pandemic, and there was a specific "'flag'" in

18   Snowflake that identified pre- and post-COVID-19 customers (*i.e.*, whether the customers purchased

19   DocuSign products before or after the onset of the pandemic).  The Company thus tracked key

20   metrics, such as product usage and retention rates, separately for customers who purchased

21   DocuSign after the COVID-19 pandemic began.  According to Class CW 1, when she started at

22   DocuSign in November 2020, the Company was already actively tracking whether customers who

23   signed up before the pandemic or during the pandemic had higher renewal or usage rates.

24        57.    According to Class CW 1, customers who signed up during the pandemic had a

25   higher churn rate and a steeper drop-off in usage than pre-pandemic customers, and these metrics

26   would have been sent to DocuSign executives. By December 2020, DocuSign's undisclosed internal

27   product usage metric, which functioned as a key sales performance indicator, showed that product

28   usage was down significantly for many customers who purchased DocuSign products after the

1   pandemic began, an important red flag that customers would not be renewing their contracts.

2   According to Class CW 1, customer product usage levels for DocuSign's products had declined

3   approximately 30% YoY by December 2020, based on internal analyses at the time.  Moreover, this

4   decline of 30% in customer product usage correlated directly to a significantly higher customer

5   renewal churn rate – as Class CW 1 saw a strong correlation between the two.  By February 2021,

6   initial internal analyses showed that not only product usage, but also customer renewal rates were

7   declining for all segments and all customers.[7]  According to Class CW 1, she shared reports with

8   these "'warning signs'" about the declining product usage and renewal rates as early as January and

9   February 2021, and possibly as early as December 2020, with VP of Global Success Operations

10  Jeremy Scheffel and SVP of Customer Success Lambert Walsh, who then probably sent the reports

11  to Springer.  The trend of declining usage was confirmed again between April and June of 2021.

12       58.     According to Class CW 1, a three-year contract term is standard in the software-as-a-

13  service ("SaaS") industry for enterprise and commercial customers, whereas one-year terms were an

14  aberration.  Nevertheless, a lot of customers who signed up for DocuSign during the pandemic

15  would only sign a one-year contract instead of a typical three-year deal because they wanted to see

16  how the pandemic progressed.

17       59.     Defendants also acknowledged to DocuSign employees that its stock price was

18  artificially inflated during the Relevant Period.  According to Class CW 1, in or around June or July

19  2021, Springer said at an all-hands meeting that Class CW 1 participated in that DocuSign stock

20  price was about $50 per share higher than it should have been.  In fact, according to CW 1,

21  DocuSign's inflated valuation was acknowledged by the whole executive board by July 2021.  Class

22  CW 1 similarly heard from other DocuSign employees that the stock price was extremely high when

23  it should not have been.  Class CW 1 understood that Springer's comments were in regard to

24  analysts and the investing public being overly optimistic about how DocuSign stock was performing,

25  and that Springer wanted to manage the employees' expectations as to the Company's true value.

26

27       [7]     Because many customers who signed up for DocuSign in March 2020 only signed up for
    one-year contracts, February 2021 would mark the time period within which the first wave of post-
28  COVID-19-related customers would be renewing (or not renewing) their contracts with DocuSign.

Class CW 1 also understood that the reason that the public was overvaluing the Company was due to the COVID-19 "'blip,'" and that, internally, all of the Company's employees knew this based on the metrics showing declining demand.

60.     **Confidential Witness 4 ("Class CW 4")** was employed by DocuSign from summer 2020 through spring 2022 as a leader within the Company's Customer Success department.  Class CW 4 ultimately reported to SVP of Customer Success Lambert Walsh, who reported to Springer. During the latter portion of her tenure at the Company, Class CW 4's responsibilities included the Strategic Enterprise segment, which she said included all enterprise customers within established verticals and was the Company's largest segment and had the largest customers, as well as the commercial segment of DocuSign's Customer Success team.  According to Class CW 4, the enterprise and commercial portfolios had a combined $600 million or $700 million worth of business, which would have represented about half of DocuSign's total business at that point.

61.     According to Class CW 4, when she joined DocuSign in summer 2020 after the pandemic had already begun, she and others at DocuSign saw a "'prevalence'" of onetime use cases by customers for DocuSign's eSignature products that would not extend beyond the pandemic – such as for the Paycheck Protection Program ("PPP") loans and other types of loans being extended at the beginning of the pandemic.  According to Class CW 4, it was not that the majority of new customers were only purchasing DocuSign for one-off COVID-19- related use cases, but rather that DocuSign was selling a "'large volume'" of business for such onetime COVID-19-related use cases to a few extremely high-volume customers, such as small fintech companies (as opposed to, for example, Bank of America) who had no other use for DocuSign after the pandemic.  As they were doing their internal analysis of DocuSign's COVID-19-related exposure from onetime use cases, Class CW 4 and others saw large spikes of sales that were concentrated in a few customer accounts, and they were concerned about how they would sustain such sales after the pandemic.  Yet even though these were onetime use cases, they were booked as recurring revenue.  Class CW 4 told others at DocuSign that she did not want to take these kinds of one-off COVID-19-related deals because they would not renew their contracts.  According to Class CW 4, Alhadeff brushed off such feedback, essentially saying "'tough shit,'" "'sign them up,'" and then "'go find other use cases'" for them; in

1    other words, sign up such customers, even if they were onetime use cases, and then try to get them to

2    expand to additional uses later.

3        62.     According to Class CW 4, VP of Sales, Renewal Management Brian Smith – who she

4    spoke with regularly in biweekly check-ins – told her that DocuSign was struggling with customer

5    renewals because the COVID-19-related onetime use cases were not renewing in late 2020 or early

6    2021.

7        63.     According to Class CW 4, alarming negative trends in customer usage and retention

8    were internally apparent by February 2021.  DocuSign was exceeding its customer churn numbers

9    and struggling with consumption (*i.e.*, usage of eSignature Envelopes) and missing its consumption

10   targets in February 2021 – as shown in data analytics that Class CW 4 presented at a quarterly

11   internal meeting (QBR) at this time, which was also attended by senior executives such as SVP of

12   Customer Success Lambert Walsh and Global Vice President ("GVP") of Customer Success Kim

13   Peretti.  At this time, DocuSign's customer retention rate was only at 70%-71%, which Class CW 4

14   described as "'horrible'" given that companies typically target 90%-95% retention.  Moreover,

15   DocuSign's consumption or usage growth was only 20% – less than half of the targeted 44% growth

16   as was also presented at this February 2021 QBR meeting.  Class CW 4 and her colleagues viewed

17   DocuSign's consumption target (of 44% growth) and other internal targets as "'unrealistic'" and

18   "'ridiculous'" at the time of this meeting.  In preparation for the meeting, however, the Customer

19   Success analytics team produced about 120 Google Slides with all the data points.  According to

20   Class CW 4, also presenting at this February 2021 QBR were Julie Valenti (former VP, Customer

21   Success Management), Matt Miller (Senior Director, Customer Success), Whitney Littman (Senior

22   Director, Customer Success Management), Natalie Power (VP, Global Success at Scale), and other

23   Customer Success leaders.  Class CW 4 believed that SVP of Customer Success Lambert Walsh

24   likely then presented a roll-up of the information that he received at this and other QBR meetings to

25   the Executive Leadership Team ("ELT"), which included the CEO and CFO, to "'manage

26   expectations'" based on what he was hearing in the QBRs.

27       64.     According to Class CW 4, she and her team "'did not have a good story'" to tell at the

28   February 2021 QBR based on the churn and consumption data analytics that were presented in the

1    meeting, which showed that customer churn was increasing and consumption was decreasing.

2    Moreover, the forecasted retention and consumption rates discussed above were for the current fiscal

3    year at the time (*i.e.*, for fiscal year 2022, which began in February 2021), and that this was only

4    getting worse as they looked at forecasts further out in the future such that those numbers for the

5    next fiscal year (*i.e.*, fiscal 2023) were projected to be "'real ugly.'"  According to Class CW 4, by

6    the February 2021 QBR, it was clear to her and others in attendance at this QBR that they were

7    "'really struggling'" because of these excessive churn numbers and consumption target misses.

8         65.    According to Class CW 4, the churn and consumption numbers discussed at the

9    February 2021 QBR above continued to worsen as they got deeper into calendar year 2021 (*i.e.*,

10    fiscal year 2022) – and that this was apparent by the next QBR in 2021, which was in the summer of

11    2021.

12         66.    **Confidential Witness 5 ("Class CW 5")** was employed by DocuSign from April

13    2020 through December 2021 as an RVP of Sales, Enterprise.  Class CW 5 reported to Adam Hack,

14    AVP, Enterprise-East, who reported to Michael Mothersbaugh, who reported to Jim Holscher,

15    former GVP of Enterprise Sales.  Class CW 5 attended weekly forecast meetings that were held

16    every Friday with all the enterprise leaders across geographical territories, as well as the RVPs,

17    AVPs, and GVP of Enterprise Sales Jim Holscher.  According to Class CW 5, Holscher and the

18    other GVPs would then meet with Alhadeff immediately following the weekly meeting that she

19    attended.  As an RVP of Enterprise Sales, Class CW 5 oversaw a team of seven Enterprise Account

20    Executives based in the mid-Atlantic region, spanning New Jersey, Delaware, Washington, D.C.,

21    Virginia, and Pennsylvania.  According to Class CW 5, customers were categorized as "'enterprise'"

22    if they had over $2 billion in revenue, regardless of the size of the contract they signed with

23    DocuSign, and DocuSign's geographical territories ("geos") were divided into three territories on the

24    East Coast, three in the central region, and three on the West Coast.

25         67.    According to Class CW 5, in summer 2020 DocuSign had some large public sector

26    and government deals that were known to be one-off deals, since they were related to extending

27    unemployment benefits.  One of these deals was a New York State deal for eSignatures for enhanced

28

1   unemployment benefits in the second quarter of calendar 2020, which would have spanned May

2   2020 through July 2020.

3       68.   Class CW 5 also saw usage and demand wane in early 2021.  For example, when she

4   took over an account in February 2021 for a customer whose contract was up for renewal nine

5   months from then, she could see their usage was poor and the customer was already telling her they

6   wanted to stop using DocuSign.  In spring 2021, she also saw one of DocuSign's biggest eSignature

7   deals that had closed just a year prior churn from $800,000 per annum to $50,000 per annum.  This

8   represented a decline of approximately 94%.  According to Class CW 5, a few other large strategic

9   accounts had been signaling for a long time (at least nine months) that they would churn from

10  $600,000 per annum to maybe $100,000 per annum or nothing – representing a decline of

11  approximately 83%.

12      69.   **Confidential Witness 7 ("Class CW 7")** was employed by DocuSign from

13  September 2018 through June 2020 as an Account Executive, Small and Medium-sized Business.

14  Class CW 7 reported to RVP John Hakewill, who reported to VP Dave Simon, who might have

15  reported to GVP Jim Holscher.  As an Account Executive, Class CW 7 was responsible for sales of

16  DocuSign's eSignature and contract lifecycle management ("CLM") products to companies with as

17  many as 250 employees.  Class CW 7's territory was originally Chicago, but she was later moved to

18  the Northeast territory.

19      70.   According to Class CW 7, before the COVID-19 pandemic began, most of the

20  Company's enterprise and commercial customers, which contributed the majority of the Company's

21  revenues, typically engaged in a three-year contract with DocuSign.  As a result, while before the

22  pandemic the majority of the Company's contracts were one year in length, most of the Company's

23  revenue was tied to three-year contracts.  This changed after the pandemic began and enterprise and

24  commercial customers would only sign one-year contracts for new use cases.

25      71.   According to Class CW 7, there were "'absolutely'" indications before she left

26  DocuSign in June 2020 that demand would eventually dry up, as many customers told her they

27  would not renew their contracts after they returned to the office after the pandemic.  While Account

28  Executives would typically push a three-year contract to ensure customers continued to use

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                          - 24 -

1    DocuSign even after the pandemic, "'nobody wanted to be in a three-year contract'" and most ended

2    up with a one-year contract instead – as customers wanted the ability to revert to the processes that

3    they were using before the pandemic without being locked into a long-term contract.  By June 2020,

4    Class CW 7's boss RVP John Hakewill, Hakewill's boss VP Dave Simon, and all the way up to the

5    CEO Springer, in all-hands meetings were encouraging salespeople to "'take advantage of this

6    time'" and of people working remotely – which Class CW 7 interpreted to mean that COVID-19-

7    related demand would eventually decline.

8           72.    According to Class CW 7, she was also encouraged to tell customers that a monthly

9    rate of $250 for a year was the best rate she could offer, even though DocuSign did offer a smaller

10   package that cost about half the price – and would tell these "'mom and pop shops,'" which were

11   struggling to stay in business, that $250 a month, or $3,000 a year, was the best rate she could offer,

12   even though the minimum contract was actually $1,500 a year.  According to Class CW 7, her boss,

13   John Hakewill, and "'leadership all the way up the board,'" were encouraging salespeople to refrain

14   from telling customers about the smaller, less-expensive packages and to push the bigger, more-

15   expensive packages instead – in order to lock in customers who would likely leave after the

16   pandemic.

17          73.    According to Class CW 7, a former colleague who still worked at DocuSign as a Mid-

18   Market Account Manager in January or February of 2021 told her at that time that she was

19   "'extremely far'" from meeting quotas and business was "'extremely slow'" – as business had

20   "'dried up'" at that time as lockdowns lifted and people returned to the office.

21          74.    **Confidential Witness 8 ("Class CW 8")** was employed by DocuSign from the

22   beginning of the pandemic through the spring of 2021 as an RVP.  As an RVP, Class CW 8 was

23   responsible for managing salespeople who were tasked with upselling and cross-selling acquired

24   products to DocuSign's existing customer base.

25          75.    According to Class CW 8, some of her customers wouldn't even discuss a multi-year

26   or 18-month contract during the pandemic because they wanted to see how the pandemic played out.

27   Moreover, some of her customers had one-off use cases that would not exist after the pandemic

28   subsided.  For instance, Door Dash used DocuSign during COVID-19 lockdowns for forms related

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                              - 25 -

1    to hiring and firing.  Uber used DocuSign for I-9 employment forms.  Some non-profit customers

2    made one-time purchases related to COVID-19.  Similarly, businesses within the healthcare vertical

3    made large one-time purchases, for uses such as sending out consent forms for COVID-19 tests.

4         76.    **Confidential Witness 9 ("Class CW 9")** was employed by DocuSign from August

5    2020 through March 2022 as an Enterprise Account Executive in the Life Sciences & Healthcare

6    verticals and was based in Chicago.  Class CW 9 reported to RVP Jeremy Ballanco, who reported to

7    VP Alpesh Patel, who reported to GVP Jim Holscher, who then reported to Alhadeff.  As an

8    Enterprise Account Executive, all of Class CW 9's clients had at least $2 billion in revenue.  In this

9    role, Class CW 9 was primarily responsible for sales to companies in the healthcare industry,

10   including hospitals, which made up the bulk of her clients.

11        77.    According to Class CW 9, as early as August 2020, many customers were saying that

12   they did not intend to renew their COVID-19-based one-off use contracts after the pandemic

13   subsided.  Accordingly, salespeople at DocuSign started to panic around February 2021 because the

14   run-up from COVID-19 was gone and nobody had new business booked at that point.  According to

15   Class CW 9, 40%-50% of her clients at that time said that they no longer needed to use DocuSign for

16   COVID-19-related use cases now that COVID-19 lockdowns had ended.  Hospitals, which made up

17   the bulk of her clients, traditionally use paper processes, and she recalled that many HR procedures

18   that relied on DocuSign during lockdowns, such as new hire paperwork, went back to using pen and

19   paper as people returned to the office during that time – and the churn was "'pretty significant'" with

20   her book of clients.

21        78.    According to Class CW 9, as the COVID-19-related demand dried up in early 2021,

22   salespeople were encouraged to sell additional products such as CLM, as management knew

23   DocuSign was going to struggle to hit its financial targets in 2021 and was looking for ways to grow

24   outside of eSignature.  Management therefore emphasized the importance of selling CLM products

25   and products from Seal Software, which DocuSign acquired in 2020.

26        79.    **Confidential Witness 10 ("Class CW 10")** was employed by DocuSign from fall

27   2020 through the summer of 2021 as a Strategic Account Executive – the highest level of Account

28   Executive at DocuSign.  Class CW 10 reported to an RVP, who reported to Wendy Blatt, who

1   reported to AVP of Enterprise Sales Cameron Kahn.  Class CW 10 was originally hired as a
2   specialist to sell CLM, but the role was dissolved around the end of November or early December
3   2020 without explanation.  During the majority of her tenure at DocuSign, Class CW 10 was
4   responsible for selling DocuSign's eSignature products to customers in the "'state and local/
5   education'" ("SLED") vertical.  According to Class CW 10, DocuSign had dashboards that tracked
6   everyone's sales performance, so you could see how you compared to other account executives on
7   the team or versus others across the country – and senior management had access to Salesforce.
8   According to her, the dashboards in Salesforce showed who entered new pipeline each week, who
9   closed certain deals, and what stage the deals were in.  While at DocuSign, Class CW 10 attended
10  various regular sales meetings, including, for example, sales meetings that were for the entire West
11  Coast region.

12      80.    According to Class CW 10, there was a "'radio button'" in Salesforce to designate
13  COVID-19-related or not COVID-19-related deals.  A COVID-19-related deal would have been
14  driven by a COVID-19-related use case, such as applications for COVID-19 relief-funded housing.
15  Class CW 10 was personally worried about such one-off COVID-19-related use cases and had
16  conversations with customers who said they were returning to the office and, thus, would have less
17  demand for DocuSign's products.

18      81.    According to Class CW 10, demand for DocuSign in her team's customers was
19  already on a "'downward slide'" in February 2021, as customers were beginning to return to the
20  office as the pandemic waned and the initial COVID-19-related special use case deals were
21  wrapping up.  At that time, Class CW 10 saw a "'noticeable gap'" between closed deals at the time
22  and closed deals the year prior.  Class CW 10 knew management was concerned about sales
23  problems due to waning demand for DocuSign's products in early 2021 because management began
24  to "'micromanage'" sales data in Salesforce at this time and were actively tracking and asking about
25  small ("'$5k deals'") or deals that were unlikely to close at the time.

26      82.    According to Class CW 10, senior management knew that sales were not going so
27  well in early 2021 because they had access to Salesforce, which provided detailed information about
28  sales.  DocuSign was "'very diligent'" about using Salesforce, and the dashboards in Salesforce

showed who entered new pipeline each week, who closed certain deals, and what stage the deals were in (at least for Class CW 10's SLED team, which are the only Salesforce dashboards she had access to).  Second-, third-, and fourth-line managers were always looking at sales deals in various Salesforce dashboards, and they could see from such sales dashboards when there were no strong pipelines or that sales were not closing or falling out of the pipeline – which would provide indicators of negative sales performance.  For instance, one particular dashboard showed data about customer renewals, which was important because renewals were among the best upsell opportunities and because DocuSign did not want to lose existing customers.  According to Class CW 10, based on such sales information in the Salesforce dashboards, management could tell sales "'were not going so well'" at the end of the first quarter of calendar year 2021.

83.     According to Class CW 10, sometime between February and early April 2021 management "'went crazy'" looking through every single sales deal in Salesforce and "'came down'" on the SLED vertical's nationwide sales team one weekend to update Salesforce metrics and ensure that data about every single deal was populated correctly – in an event she referred to as the "'Red Weekend.'"  According to Class CW 10, management went into a "'hysteria'" about the sales personnel properly filling out the various sales data in Salesforce, and Class CW 10 likely coined the term "'Red Weekend'" to refer to this project because she felt like it was a "'blood bath'" for sales personnel.  This "'Red Weekend'" was a "'top-down'" directive from senior management so that upper management would review everything in Salesforce either that day or the following day.

84.     **Confidential Witness 11 ("Class CW 11")** was employed by DocuSign from October 2020 through July 2021 as an Account Executive.   In this role, Class CW 11's responsibilities included converting DocuSign customers who had outgrown their monthly plan to an annual plan.

85.     According to Class CW 11, many of her clients expressed that they were seeing significant growth tied to the pandemic, which created a short-term need for additional DocuSign Envelopes while everyone worked remotely.  This was a "'narrative that we heard consistently'" during her time with the Company.  More importantly, however, these same clients told Class CW 11 they planned to return to pen and paper signatures after the pandemic ended.

86.   **Confidential Witness 12 ("Class CW 12")** was employed by DocuSign from May 2015 through May 2021 (with a leave of absence beginning in November 2020), with her most recent title being a Senior Analytics Manager in the Customer Success department.  Class CW 12 reported to Anshul Saxena, Senior Director, Customer Success Analytics & Data Science, who in turn reported to Lambert Walsh, former SVP of Customer Success.  When she started at the Company, Class CW 12's job responsibilities included providing analytical support to the Customer Success department by analyzing customer retention and abandonment rates, among other metrics. Class CW 12 also helped create a "'customer adoption index,'" which documented several internally tracked metrics for the Company.  According to Class CW 12, this customer adoption index tracked, among other metrics, the number of Envelopes leveraged or used by customers against the total number purchased; whether sales successfully upsold additional resources to the customer during its most recent renewal; and whether customers engaged with the Customer Success team during the contract.

87.   According to Class CW 12, the Company did not adopt different metrics pre- and post-COVID-19.  During the height of the COVID-19 pandemic, the Company's focus was much more on dealing with the surge in new customers, getting those customers helped and up to speed, with less attention on forecasting – as there was a "'scramble'" to help address the influx of customers.  According to Class CW 12, Springer was using historical customer retention rates – using pre-COVID-19 numbers – as a guide for forecasting what future growth and retention rates would be.  According to Class CW 12, at the time she went on a leave of absence from DocuSign in November 2020, she did not think that anyone was "'looking at'" projecting the retention rate for new customers added post-COVID-19 yet.

88.   **Confidential Witness 13 ("Class CW 13")** was employed by DocuSign from June 2021 through April 2022 as an Account Executive, Major Accounts.  Class CW 13 initially reported to Jessica Shane – who in turn reported to AVP Anne Wilbur – until Shane was promoted to AVP in February 2022.  Class CW 13 thereafter reported to RVP Kelli Pillino, who reported to AVP Justin Gilleg.  According to Class CW 13, she believed Wilbur and Gilleg reported to Alhadeff.  In her role as an Account Executive, Class CW 13 was responsible for sales of eSignature to higher education

institutions located in the western United States.  According to Class CW 13, the entire sales organization, "'from top to bottom'" and including executives as senior as the CRO, had access to information in Salesforce – which is where leadership got all their reporting and analysis when it came to forecasting numbers.  According to Class CW 13, all customer and prospective customer data lived in Salesforce, including information about renewals and revenue.

89.     According to Class CW 13, sales leadership including Alhadeff, discussed all throughout her tenure that 2021 was an "'unprecedented down year,'" beginning when she joined DocuSign in June 2021 and continuing until she left in April 2022.  Such statements were made at team meetings and Alhadeff's were made at town halls.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

90.     Beginning in June 2020, and throughout the remainder of the Relevant Period, Defendants issued a series false and misleading statements and omissions regarding the sustainability of the COVID-19-induced demand for DocuSign products.  In doing so, Defendants sought to and did mislead the market to believe that the Company's accelerated growth in 2020 and early 2021 was attributable to a sustainable shift in demand, and that its customers would not go back to pen and paper signature processes after the pandemic subsided.

### A.     In June 2020, Defendants Began Claiming that DocuSign's New COVID-19-Related Customers Would Not Return to Manual Signature Processes After the Pandemic – Despite Internal Red Flags to the Contrary

91.     On June 4, 2020, DocuSign issued a release and convened a conference call to discuss the Company's earnings results for fiscal quarter ended April 30, 2020 ("1Q21").  During prepared remarks on the 1Q21 conference call, Springer asserted that the pandemic had served as a catalyst for a long-term digital transformation among DocuSign's client base, and that its clients would continue to use its eSignature offerings even after the pandemic receded:

> Remote work is here to stay.  Core business processes will only become more digital and agreements will need to be completed from anywhere, at any time, on almost any device.  As a result, for organizations that hadn't already embraced DocuSign for eSignature, where they were only using us for a few select use cases, the pandemic has been a catalyst for the greater digital transformation of their end-to-end agreement processes.

We always believed this transformation will happen and that a unifying platform for agreements would be needed.  With COVID-19, it's just happening faster.  ***That said, even when the COVID-19 situation is behind us, we don't anticipate customers returning to paper or manual-based processes.  Once they take their first digital transformation steps with us and they realize the time, cost and customer experience benefits, they rarely go back***.[8]

92.     Sheridan similarly stated on the 1Q21 conference call that the unprecedented demand for DocuSign products caused by the pandemic would lead to long-term customers:

[T]he worldwide shift to remote work has accelerated digital transformations across organizations and has resulted in unprecedented levels of demand for DocuSign products.  We believe this accelerated growth in new customers and expansion within our installed base was driven by a sudden prioritization of our products, ***but we also believe that these customers will remain with us*** . . . .

93.     During the question-and-answer ("Q&A") portion of the 1Q21 conference call, in response to a direct question from an analyst as to whether DocuSign's billings growth was part of a "onetime bump" from COVID-19-related use cases, Sheridan maintained that such clients were in the "extreme minority":

[Analyst:] That was very helpful.  And then one quick follow-up here.  Obviously, there was the PPP program and things like that.  You alluded to some of these sort of onetime events.  Now obviously offset by maybe lower mortgage applications, right, because of the environment.  But is there a way to give us some color of how much you feel like part of the business, the growth that billings was sort of a onetime aspect?  And again, offset by a decline, what's the reg rate, regular rate business, but just trying to understand sort of what that onetime bump might have been.  If you can give any color around that?

[Sheridan:] Yes.  There definitely will be some examples that are use cases that are more project-oriented or onetime in nature.  ***We see that as the extreme minority***.

94.     And in response to another question from an analyst regarding the churn rate of smaller customers who had signed up during the pandemic, Sheridan claimed that the Company was not "analogous to Zoom" and that its churn rate would "remain pretty stable . . . whether it's a work-from-home environment or not":

[Analyst:] I'm just wondering how much of the growth – and I know you don't actually give this out, but some context would be great.  How much of the revenue growth comes from the self-service channel?  And because if I look at that, I mean, your number of direct customers went sort of from 6,000 to 10,000 from Q4 to Q1, but the self-service went from 21,000 last quarter to 58,000.

---

[8]     Defendants' statements in ***bold italics*** are those alleged to be materially false and misleading as the bases for Plaintiffs' Rule 10b-5(b) claim.  Surrounding statements are provided for context.

1  
2  And the context there, as I'm sure you listened to yesterday, is that Zoom's guidance was pretty flat versus having just this massive Q1 because of their concern that those smaller customers that signed up for Zoom might churn off as we open back up. So I'd just love to hear your perspective on that.

3  
4  [Sheridan:] Yes. Let me start on the churn perspective. **We don't think that our situation is analogous to Zoom volumes and so forth. As I mentioned previously, we believe that, of course, our business, like any, has churned. We think it's going to remain pretty stable because we think that the value propositions, again, we're delivering are sustainable, whether it's a work-from-home environment or not**.

5  
6  

7  95.     On June 10, 2020, the week after the 1Q21 conference call, Springer gave a

8  presentation on behalf of DocuSign at the William Blair Growth Stock Conference. When asked

9  about the sustainability of the Company's growth post-COVID-19, Springer again asserted that the

10  majority of the Company's recent growth spike was not caused by one-off COVID-19-related use

11  cases:

12  [Analyst:] But how should we think about sustainability of growth? Whatever you're comfortable sharing, but we'd love to understand a little bit. As you think about this business, you think about, again, the awareness we just talked about and more cottage industry, more embedability, more API calls, how should we think about sort of that sustainability of growth and the conservativeness you built in, offset by what should happen even now coming out of COVID?

13  
14  
15                                  *        *        *

16  [Springer:] [O]ne of the concerns some organizations – like Zoom is a great example, because they had this explosive piece, and as Eric talks about that, he always has some caution and says, some of these are activities that we think might go back off-line once people get back into their offices. We've tried to look hard for that. **While there are some COVID-19 very specific use cases that we could imagine that might happen to, the majority of the things that we've seen has just been an acceleration**. People have taken the road map they had, what they wanted to do when they pulled that forward because they're in a work-from-home situation, certain use cases needed to get done very quickly in that format. So from that standpoint, we feel pretty bullish about the growth prospects.

17  
18  
19  
20  
21  

22  96.     The statements detailed in ¶¶93-97 above were each false or misleading when made.

23  The true facts which were then known to or recklessly disregarded by each of the Individual

24  Defendants include:

25                  (a)     According to numerous CWs, Defendants were aware of significant internal

26  red flags indicating that the surge of new customers who purchased DocuSign eSignature products

27  would not remain long-term customers after the pandemic, including that customers: (i) informed

28  DocuSign employees in early 2020 that they did not intend to (and ultimately did not) renew their

1   contracts with DocuSign once they were able to return to their offices; (ii) contracted with DocuSign

2   for a significant number of one-off COVID-19-related use cases that would not recur or renew after

3   the pandemic ended; (iii) were largely signing up for short-term, one-year eSignature contracts –

4   rather than the three-year contracts that DocuSign sales representatives were directed to push.

5           (b)     CWs were told that their customers intended to revert to manual signature

6   processes after the COVID-19 lockdowns ended.  According to Class CW 7, there were

7   "'absolutely'" indications before she left DocuSign in June 2020 that demand eventually would dry

8   up, as customers told Class CW 7 they would not renew their contracts after they returned to the

9   office.  Class CW 9 similarly stated that as early as August 2020, many of her customers were saying

10   that they did not intend to renew their COVID-19-based one-off use contracts after the pandemic

11   subsided.  Class CW 11 had a similar experience, as many of her clients told her that they planned to

12   return to pen and paper signatures after the pandemic ended.

13           (c)     CWs also confirm that DocuSign was signing a significant amount of

14   customers in 2020 for one-time use cases that would not recur after the pandemic ended.  According

15   to Class CW 4, when she joined DocuSign in summer 2020, she and others at DocuSign saw a

16   "'prevalence'" of one-time use cases by customers for DocuSign's eSignature products that would

17   not extend beyond the pandemic – such as for PPP loans and the other types of loans being extended

18   at the beginning of the pandemic.  Class CW 8 similarly had customers sign up for one-off use cases

19   that would not exist after the pandemic subsided, such as Door Dash and Uber, who used DocuSign

20   during lockdowns in order to complete paperwork that normally would have been done in person,

21   such as forms related to hiring and firing.  Class CW 10 was likewise worried about such one-off

22   COVID-19-related use cases and had conversations with customers who said they were returning to

23   the office and, thus, would have less demand for DocuSign's products.

24           (d)     CWs also confirm that new customers who subscribed to DocuSign during the

25   pandemic refused to sign long-term, three-year contracts – and instead opted for one-year contracts

26   to ensure the flexibility to return to traditional contracting processes once they returned to the office.

27   For instance, FE 1 estimated that 70% of her smaller accounts were signing one-year contracts

28   during the pandemic, as clients did not want to commit to three-year deals when there were still

1    questions regarding the effect and duration of the COVID-19 pandemic.  FE 2 reported that even

2    with the record number of new accounts that came in at the start of the COVID-19 pandemic, it was

3    very difficult for her to sell three-year contracts – and the most common accounts she sold were one-

4    year contracts.  FE 3 similarly stated that the majority of the COVID-19-related accounts that she

5    saw were only signed for one-year contracts.  According to Class CW 1, while a three-year contract

6    term is standard in the SaaS industry for enterprise and commercial customers, a lot of customers

7    who signed up for DocuSign during the pandemic would only sign a one-year contract.  According

8    to Class CW 7, before the COVID-19 pandemic began most of the Company's enterprise and

9    commercial customers typically engaged in a three-year contract with DocuSign – but this changed

10   after the pandemic began and enterprise and commercial customers would only sign one-year

11   contracts for new use cases.

12          (e)    In addition to the aforementioned red flags, Springer's statement that

13   customers "rarely go back" to pen and paper after beginning to use DocuSign was also predicated on

14   flawed pre-COVID-19 metrics, which were not updated until over a year after the pandemic began,

15   and were not representative of customers who signed up during the pandemic.  According to Class

16   CW 12, Springer was using historical customer retention rates based upon pre-COVID pandemic

17   numbers as a guide for forecasting future growth and retention rates without any internal analyses or

18   data to support that assertion as it related to customers signing with DocuSign after the start of the

19   pandemic.

20          97.    Analysts were swayed by Defendants' statements, however, with numerous analysts

21   issuing reports on June 4 and June 5, 2020, after the 1Q21 earnings call, echoing Defendants' claims.

22   For example:

23          (a)    JMP Securities reported that they "believe[d] that, unlike many of the use

24   cases for videoconferencing, once people and businesses switch to electronic signatures, they are

25   very unlikely to ever go back to physical signatures";

26          (b)    RBC Capital Markets similarly stated that "[w]hile COVID benefited the

27   quarter, we believe demand trends are durable and pipeline strong" and "[w]hile the narrative around

28   a very strong quarter and conservative guide is a simplistic summary of events we think the bigger

1  multi-year investment opportunity is increasingly more obvious to us.  Once a customer starts

2  DocuSigning, they don't go back to paper"; and

3          (c)     Deutsche Bank Research highlighted that "adoption of DocuSign accelerated

4  amidst the work from home phenomena" and that "[e]ven more encouraging is DocuSign's

5  messaging that the quarter was strong excluding the tailwinds from the pandemic and that new

6  customers and expansions realized in this environment are here to stay."

7          98.     Similarly, following Springer's statements at the June 10, 2020 William Blair Growth

8  Stock Conference, William Blair published a report the same day highlighting that "[i]ncreased

9  [a]ctivity [i]s [h]ere to [s]tay" and that "it is very unlikely that a business will switch back to using

10  pen and paper after setting up e-signature solutions."

11      **B.     In September 2020, Defendants Continued to Misleadingly Claim that
             COVID-19-Induced Growth Would Continue Beyond the Pandemic**

12

13          99.     On September 3, 2020, DocuSign issued a release and convened a conference call to

14  discuss the Company's earnings results for fiscal quarter ended July 31, 2020 ("2Q21").  During

15  prepared remarks on the 2Q21 conference call, Springer reiterated his prior comments that

16  DocuSign's pandemic-induced growth would "persist beyond the crisis":

17          I spoke last quarter about how so many of [DocuSign's customers] faced a
         sudden need to transition to remote work when the pandemic first hit.  Today, that
18         need has evolved from an initial crisis response to a business necessity.  And because
         agreements are central to doing business, the need to agree electronically and
19         remotely has never been stronger.  ***This is causing greater adoption of our
         offerings, something we believe will persist beyond the crisis.  Because in our
         experience, it's very rare to see anyone go back to paper once they've gone digital***.

20

21          100.    Springer's prepared remarks went on to claim that the heightened demand trends the

22  Company had reported were continuing:

23          Our operating margins and cash flows reached record levels, while we
         continue to make key investments to address the heightened demand.  ***As is evident
24         from these numbers, the trends that emerged in the latter half of Q1 have
         continued throughout Q2.  We've seen a sustained rise in demand for our core
25         eSignature offering, not only from new customers, but also those expanding across
         use cases, departments and borders***.

26          101.    During the Q&A portion of the call, in response to a question about how the

27  Company planned on driving sales in a more "normalized situation," Sheridan once again

28  maintained that the Company's growth trends would not revert to pre-COVID-19 pandemic levels:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                                    - 35

1    [Analyst:] [H]ow do you think about driving sales once we get into the situation
2    where maybe people here are on fire and COVID is at least – we worked through it
     being more of a normalized situation as opposed to the situation we're in right now?

3                                    *       *       *

4    [Sheridan:] It is our view that as we work through these difficult times, though,
     **there's a greater awareness of need to digitize the business. And we believe that,**
5    **that's going to be sustained even after things return to whatever normal looks like**
     **in the future**. So we do believe that we're entering into a period of a "new normal."
6    It doesn't necessarily mean that the highs of any particular quarter are going to be
     sustained forever. But at the same time, **we don't see trends that things are going to**
7    **return to the way they looked and trended pre-COVID**.

8        102.    Later that month, on September 14, 2020, Springer gave a presentation on behalf of

9    DocuSign at the Deutsche Bank Virtual Technology Conference. In response to a question as to

10   whether demand had begun to "normalize a bit or not," Springer again repeated that DocuSign's

11   pandemic-induced business was "here for the long term":

12   [Analyst:] I guess in terms of just today and what we're seeing as we look ahead, so
     how would you characterize pipeline momentum or new lead generation at the start
13   of 3Q relative to the first half of this year or even prior quarters? Curious if the
     acceleration and new use cases and customers coming back to you and asking about
14   those, if you're seeing that same level of activity or if it's starting to normalize a bit
     or not.
15
                                     *       *       *
16
     [Springer:] [T]he other piece that you talked about on our calls in the past is just what
17   do we think is going to happen with that demand that we had as people move work
     from home, we feel very strongly that once people have gone digital from their
18   paper-and manual-based processes, **they don't go back. No one's going to**. . . .
     When you get back in the office, you don't go, "Yes, I'd love to go back to that thing
19   again where I typewrite a letter and mail it out." **It just doesn't happen**, yes, so we
     feel pretty confident that those use cases that have accelerated, as you articulated it,
20   **they're here for the long term**.

21       103.    The next day, on September 15, 2020, Springer gave another presentation on behalf

22   of DocuSign at the Jefferies Software Virtual Conference. In response to a question on the

23   "durability" of the "digital transformation" brought on by the COVID-19 pandemic, Springer

24   responded with an "incredibly high degree of confidence" that "people don't go back" to manual

25   processes:

26       [Analyst:] Yes. Just on that comment, I think everyone's asking the
         durability of what many of the software companies are seeing with the pandemic. . . .
27   And so maybe just talk to your sense of the durability and what you think about this
         whole digital transformation, how long-lasting can this be.

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                              - 36

[Springer:] . . . [W]ith an incredibly high degree of confidence and, I'd say, a degree of confidence. The first piece is for the transformation we've had to date, there's been a lot of questions about if people brought stuff into the DocuSign world, that once we're in a – whatever a new normal might look like, not everyone's working from home, will somewhat pull back. And ***I feel very strongly the answer is people don't go back***.

When you've taken the opportunity to transform your processes to a digital solution and think about it in our core Signature business, it means people are having much – a more attractive ROI from that move. They save a huge amount of money. They're not FedEx-ing documents back and forth or hand-delivering. Documents are not manually processing so much information. They can leverage the technology not only for sending out agreements and have come back, but those act space we talked about to integrate with your other software systems, our clients are seeing incredible cost savings and a better end customer experience. So the folks that they're transacting with and doing agreements say, hey, this is a better way to work with you. And employees realize even some people have changed management challenges, once they get to the other side, obviously, no one's going back. So ***we don't feel there's a sense of stuff that's accelerated this year would disappear***.

104.    The statements detailed in ¶¶101-105 above were each false or misleading when made for all the same reasons set forth above in ¶98(a)-(e), *supra*.

105.    Again, analysts took Defendants at their word and published numerous reports on September 3 and 4, 2020, after the 2Q21 earnings call, repeating Defendants' claims. For instance:

(a)    RBC Capital Markets noted that "[w]hen asked on the call back about the durability of bookings success, management noted that no one was nervous about the company's ability to execute. Additionally, the company believes that there is a 'new normal' that will benefit the company even after the pandemic subsides";

(b)    William Blair "expect[ed] strong momentum to continue and for the company to continue to Outperform software peers," as "DocuSign's recently added customers are likely to continue expanding usage of e-signature and CLM solutions after the pandemic"; and

(c)    JMP Securities highlighted that "the COVID-19 crisis seems to be accelerating the adoption of DocuSign's digital system of agreement, and we expect such adoption to stick as people simply do not go back to paper."

**C.    Despite Declining Usage Rates, in December 2020 and January 2021 Defendants Continued to Deny that COVID-19-Related Customers Would Go Back to Pen and Paper**

106.    On December 3, 2020, DocuSign issued a release and convened a conference call to discuss the Company's earnings results for its fiscal quarter ended October 31, 2020 ("3Q21").

1   During prepared remarks on the 3Q21 conference call, Springer repeated the Company's drumbeat

2   refrain that new customers brought on during the pandemic would not go back to pen and paper

3   processes:

4   *When customers go from paper-based processes to digital agreement processes,*
    *they do not go back. We believe that trend will hold when the pandemic subsides*
5   and that DocuSign's value will persist no matter how the future of work unfolds.

6   107.    Gaylor followed up on this point in her prepared remarks, echoing the claim that new

7   customers brought on during the pandemic would not go "back to pen and paper":

8   *DocuSign's value proposition remains strong, whether customers began using our*
    *product before or after the pandemic began. We don't see customers going back to*
9   *pen and paper.*

10   108.    During the Q&A portion of the call, in response to a question as to whether "demand

11   was pulled forward" by the pandemic, Springer reassured investors, specifically dispelling the notion

12   that DocuSign was "robbing from the future" such that demand would decrease in future quarters:

13   [Analyst:] I think you made it pretty clear, and we all get it. No one's going back to
     pen and paper. But the growth and the acceleration of this has been phenomenal.
14   And I guess, do you feel like demand was pulled forward? And how should we
     think, I know you're not giving guidance, but how should we think about next year,
15   if we did see this acceleration pull forward verticals that may have been slower to
     adopt accelerating it? How do we sort of handicap or think about that?

16                                  *       *       *

17   [Springer:] *And so my view on it is that we've seen is not so much a pulling*
18   *forward of demand but therefore now won't happen in the future*, but that we're
     looking at the long game of all of that market opportunity to penetrate. We're just
19   executing at a higher rate today. And *so we've accelerated that growth not because*
     *we're sort of robbing from the future, but we're just getting closer towards that $25*
20   *billion TAM opportunity.*

21   109.    The following month, on January 11, 2021, Gaylor gave a presentation on behalf of

22   DocuSign at the Needham Virtual Growth Conference. In response to a question regarding the

23   pandemic's effects on DocuSign's eSignature business, Gaylor repeated the Company's refrain that

24   customers would not go back to pen and paper processes:

25   [Analyst:] [I]t's been well documented that the benefit DocuSign saw as the
     pandemic unfolded. Businesses still needed to get done. And of course, eSignatures
26   was a key solution to facilitate this business requirement. But I guess, bigger scale,
     how should we think about the pandemic accelerating the overall use of the
27   eSignature functionality?

28                                  *       *       *

[Gaylor:] I think the great news for DocuSign is we believe that the acceleration to digital is, it's just *the pandemic really accelerated what people were otherwise going to do.  And so it's not kind of a one and done sort of mentality*. It's really a kind of progression of things that were going to happen over a period of time.

. . . We saw that kind of in mid-Q1 into Q2 and some in Q3 as well, and *we kind of continue to see that accelerated demand.  But we believe it's kind of once people move from manual processes, pen and paper, they're not going to go back once they kind of have the DocuSign experience and are in the kind of more digitized experience.  So we've certainly been a beneficiary of that demand, but we also believe that, that demand will continue*.

110.    Gaylor repeated this claim later on in the presentation, stating "[a]s I said, *people, once they move on to our platform and into kind of our product portfolio, they don't tend to go back to pen and paper*."

111.    The statements detailed in ¶¶108-112 above were each false or misleading when made for all the same reasons set forth above in ¶98(a)-(e), *supra*.  Moreover, additional true facts which were then known to or recklessly disregarded by each of the Individual Defendants at this time include:

(a)    According to Class CW 1, by December 2020 customer usage levels had declined by approximately 30% YoY – which strongly correlated with higher churn rates – and that she shared reports with these "'warning signs'" about product usage and renewal rates with her supervisor and SVP of Customer Success Lambert Walsh, who then probably sent the reports to Springer.

112.    Numerous analysts repeated and highlighted Defendants' claims in reports published on December 3 and December 4, 2020, after the 3Q21 earnings call.  For instance:

(a)    Evercore ISI noted that "[w]hile DocuSign will run into more difficult comps in CY21, DocuSign is not just a 'work from home' story as customers are not going to switch back to pen and paper when employees return to the office";

(b)    RBC Capital Markets similarly highlighted that: "What is even more impressive in our minds is that this is being driven almost entirely by an acceleration of the core e-signature business with the company being confident . . . that they can maintain growth above pre-pandemic levels in a post-pandemic world"; and

1     (c)     Morgan Stanley stated that it came away encouraged by "management

2  commentary on the long-term opportunity at DocuSign (including increasing interest in the broader

3  Agreement Cloud and the important role eSignature will play beyond COVID-19), and remain

4  confident that many levers remain in place for durable growth."

5     **D.     Defendants Concealed Worsening Demand Trends and Renewal
           Rates in Early 2021, and Continued to Claim in March 2021 that Its
6           Customers Do Not Leave**

7     113.    On March 1, 2021, Springer gave a presentation on behalf of DocuSign at the Morgan

8  Stanley Technology, Media and Telecom Conference.   In response to a question regarding

9  opportunities for the Company in 2021, Springer again claimed that customers who joined during the

10  COVID-19 pandemic were there for the long haul:

11      [Analyst:] So as you now head into 2021, right, when you think about the
       opportunities that you now are carrying out of 2020 into 2021, which ones do you
12      think that may not have been there pre-COVID?

13                              *       *       *

14      [Springer:] And when I think about going forward, we think 2 big things.
       One, people are going to continue to accelerate on their digital transformations
15      because they're seeing the incredibly high – higher ROI.  So that's for sure one.
       Second is *no one's going back to paper and manual process*.  Once you transform
16      your business that way, seeing the value, sort of done the work, right.  *Going back to
       paper, going back to the manual processes and the time lags and the cost increases,*
17      *we just don't see people going back in use cases*.

18     114.    On March 11, 2021, DocuSign issued a release and convened a conference call to

19  discuss the Company's earnings results for its fiscal quarter and fiscal year ended January 31, 2021

20  ("4Q21" and "FY21," respectively).   During prepared remarks on the FY21 conference call,

21  Springer reiterated that the spectacular growth DocuSign had seen during the pandemic was

22  sustainable over the long term, as those customers would not be "going back to paper even after the

23  pandemic recedes":

24          As a team, DocuSign was honored to play a role supporting people all over
       the world as they responded to the pandemic.  We gained new customers, we
25      expanded our relationship with others and we saw a surge in adoption of our products
       as accelerating a trend already underway, the digital transformation of agreements.
26      This transformation not only allows agreements to be prepared, signed, act on and
       managed from anywhere.  It also allows greater speed and efficiency than manual
27      paper-based processes.   As a result, *we don't believe our new or expanded
       customers will be going back to paper even after the pandemic recedes*.  We also
28      don't believe life will go back to the way it was before.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                              - 40 -

115.     During the Q&A portion of the call, in response to a question as to whether the Company was seeing any "return to normalcy" in demand, Springer again repeatedly denied a return to normalcy and claimed that the new customers brought on by the COVID-19 pandemic were not going back:

> [Analyst:] [A]s February and March have started here, is there any change in the demand environment based on more of a return to normalcy?
>
> [Springer:] ***We haven't seen anything***.  I don't know whether we would be a leading or a lagging indicator, Pat.  But ***we haven't seen anything in our business that suggests that, that will change***.  Now if you recall, we've said this about – starting about 3/4 ago, that our forecast on this is that the people that have come with new customers or new use cases to DocuSign that are COVID-19-centric, ***they're not going back.  People aren't going back to paper.  They're not going back to manual processing***.  So, the real question, I think, is interesting in your question is, will that rate of new people coming to us change with – as we start to move into some sort of return to "normalcy."  ***We haven't seen any change yet***.  And maybe that the change isn't enough and there's not enough new activity to have driven the change in the demand environment.  ***But at this point, yes, we haven't seen a change yet***.

116.     On March 24, 2021, Springer, Gaylor, Alhadeff, and other DocuSign executives presented at DocuSign's Virtual Financial Analyst Day.  In the first question of her interview of Springer, Gaylor downplayed the Company being a mere "work-from-home stock" and claimed that the Company's impressive performance trends were "really here to stay":

> So some have been pegging us as a work-from-home stock.  And ***the permanence of the trends we've been seeing across the business look like they're really here to stay***.  We also on our earnings call last week talked a little bit about the anywhere economy.  So I want you to talk to us a little bit about why investors should be excited about the anywhere economy. [sic] and where DocuSign plays in that?

117.     During the Q&A portion of the presentation, DocuSign's VP of Investor Relations Annie Leschin presented Defendants with several questions from analysts and investors.  In response to a question about "how investors should think about DocuSign post-pandemic," Springer again assured investors that the Company's growth was "not a short-term thing":

> [Leschin:] What we're looking at here is in terms of ultimately how investors should think about DocuSign post-pandemic?  The sustainability of our growth and why you believe DocuSign will be above pre-COVID levels.
>
> *          *          *
>
> [Springer:] [T]he transformation that our customers are undergoing and leveraging DocuSign to drive, ***this is not a short-term thing.  This is not something that just sort of happened because of the pandemic***.  This is something that was happening and it's been happening for years, and ***we believe it's going to continue to happen***

*for years*.  We think that what we've seen happen, because of the pandemic, is that *we've seen sort of a onetime step-up where people actually accelerated their transformation at a faster rate*.

118.    On March 31, 2021, Alhadeff issued a public post on the social media platform formerly known as Twitter, claiming that DocuSign's levels of adoption would not significantly change post-pandemic: "*I don't see levels of adoption @DocuSign changing significantly post-pandemic*."



Loren Alhadeff
@LorenAlhadeff

I don't see levels of adoption @DocuSign changing significantly post-pandemic. Once a company sees the benefits of a digital process, there's multiple reasons to stay with it. protocol.com/enterprise/doc…

11:13 AM · Mar 31, 2021

119.    The statements detailed in ¶¶115-120 above were each false or misleading when made for all the same reasons set forth above in ¶¶98(a)-(e) and 113(a), *supra*.  Moreover, the additional true facts which were then known to or recklessly disregarded by each of the Individual Defendants at this time include:

(a)    Multiple CWs confirm that by March 2021, DocuSign had even further confirmation of decreased customer usage rates and increased customer churn.

(b)    FE 2 observed that SMB accounts were starting to churn and companies were not renewing expiring contracts in early 2021, and FE 2 indicated that the SMB segment was hit the hardest by accounts churning after the COVID-19 pandemic subsided.

(c)    According to Class CW 1, by February 2021, initial internal analyses showed that not only product usage, but also customer renewal rates were declining for all segments and all customers.  Class CW 1 shared reports with these "'warning signs'" about the declining product usage and renewal rates with VP of Global Success Operations Jeremy Scheffel and SVP of Customer Success Lambert Walsh at this time, who then probably sent the reports to Springer.

(d)    Class CW 4 similarly saw alarming negative trends in customer usage and retention rates that were internally apparent by February 2021 at the latest.  DocuSign was exceeding its customer churn numbers and struggling with consumption (*i.e.*, usage of eSignature Envelopes)

1   and missing its consumption targets – as shown in data analytics that Class CW 4 presented to SVP

2   of Customer Success Lambert Walsh and other senior sales staff at a QBR meeting in February

3   2021.  At this time, DocuSign's customer retention rate was only at 70%-71%, which Class CW 4

4   described as "'horrible'" given that companies typically target 90%-95% retention.  Moreover,

5   DocuSign's consumption or usage growth was only 20% – less than half of the targeted 44% growth.

6   Class CW 4 believed that Walsh likely then presented a roll-up of this and other information that he

7   received at this and other QBR meetings to the ELT, which included Springer, Gaylor, and other

8   executives.

9           (e)     Class CW 5 also saw usage and demand wane in early 2021.  For example,

10  when she took over an account in February 2021 for a customer whose contract was up for renewal

11  nine months from then, she could see their usage was poor and the customer was already telling her

12  they wanted to stop using DocuSign.  In spring 2021, she also saw one of DocuSign's biggest

13  eSignature deals that had closed just a year prior churn from $800,000 per annum to $50,000 per

14  annum.  This represented a decline of approximately 94%.

15          (f)     According to Class CW 9, salespeople at DocuSign started to panic around

16  February 2021 because the run-up from the COVID-19 pandemic was gone and nobody had new

17  business booked at that point.  According to her, 40%-50% of her clients at that time said that they

18  no longer needed to use DocuSign for COVID-19-related use cases now that COVID-19 lockdowns

19  had ended.

20          (g)     According to Class CW 10, demand for DocuSign in her team's customers

21  was already on a "'downward slide'" in February 2021, as customers were beginning to return to the

22  office as the pandemic waned and the initial COVID-19-related special use case deals were

23  wrapping up.  At that time, Class CW 10 saw a "'noticeable gap'" between closed deals at the time

24  and closed deals the year prior.  Class CW 10 knew management was concerned about sales

25  problems due to waning demand for DocuSign's products in early 2021 because management began

26  to "'micromanage'" sales data in Salesforce at this time.

27

28

120.    Numerous analysts issued reports on March 11 and March 12, 2021, after the FY21 earnings call, demonstrating that the market remained convinced of Defendants' false and misleading claims.  For example:

(a)    Evercore ISI stated that "DocuSign is NOT just a WFH story.  While COVID clearly accelerated demand in 2020, we believe the secular demand trends are durable and DOCU is just at the tip of the iceberg in terms of its broader platform opportunity . . . ";

(b)    William Blair assured investors that "[w]hile customers in other industries may churn following the pandemic, we do not believe DocuSign will experience any uptick to its normal churn cadence.  In fact, we believe the company could begin experiencing larger up-sell opportunities in the next several quarters due to the amount of customers it has landed in recent quarters"; and

(c)    D.A. Davidson remained convinced that the "[p]ost-[p]andemic [o]utlook is [s]trong" as "DocuSign is benefitting from irreversible changes in the nature of work."

121.    Similarly, following the Company's Analyst Day on March 24, 2021, numerous analysts issued reports the same or the following day highlighting Defendants' claims.  For example:

(a)    William Blair stated that "[w]hile customers in other industries may churn following the pandemic, we do not believe DocuSign will experience any uptick to its normal churn cadence";

(b)    Morgan Stanley reported that the Company's "[m]anagement sees DocuSign well-positioned to penetrate the estimated $17 billion Agreement Cloud opportunity given: 1) a global shift to the 'Business Anywhere' mindset that should remain post-COVID"; and

(c)    Piper Sandler highlighted that "[t]he inaugural Analyst Day shed light on DocuSign's strategy to maintain its pace of expansion and innovation coming off a year of acceleration."

**E.    While Demand Trends Worsened Further, in June 2021 Defendants Continued the False and Misleading Drumbeat that Customers "Simply Don't Go Back"**

122.    On June 3, 2021, DocuSign issued a release and convened a conference call to discuss the Company's earnings results for its fiscal quarter ended April 30, 2021 ("1Q22").  During

prepared remarks on the 1Q22 conference call, Springer reiterated that DocuSign's new customers

"simply don't go back" after the pandemic:

> Since the start of the pandemic, DocuSign has helped accelerate access to healthcare, government, education, small business lending and many other services around the world.  What began as an urgent need has now transformed into a strategic priority.  And as a result, DocuSign has become an indispensable part of many organizations' business processes.
>
> Put another way, ***once businesses usually transform their agreement processes, they simply don't go back.  We believe this trend will only accelerate as the anywhere-economy continues to emerge***.

123.    During the Q&A portion of the call, Springer repeated similar statements in response

to a question regarding the Company's growth rate post-COVID-19:

> [Analyst:] [O]ne of the fears I think people have had historically on DocuSign is that it's just a COVID stock.  You're going to start decelerating as you start seeing these tough comps.  But I think some people forget that you're a capacity-based model.  And therefore, if you're seeing these cohorts that you added last year grew at or above previous rates, which it seems like you are with the expanding dollar base net expansion, you're very well positioned to actually grow right through this and be even better positioned on the other side.  So just talk through that, what you saw this quarter around the growth rate of those cohorts and kind of how you're positioned going forward.
>
> [Springer:] . . . I don't know how people are missing it.  You write about it in every report.  I see you make that point, which I appreciate, by the way.  So hopefully, people will start to listen more to your insight.  But I think you nailed it.  I think that's exactly what we're seeing.  We're seeing that the phenomenon of that strong customer growth is why you see the net retention rate so high. . . .
>
> And I really think the key to it is it's what we talked about at the beginning of the call.  It's the phenomenon to people, ***once they see the benefits of the digital transformation, particularly around the Agreement Cloud from having opportunity to grow their business with us, they don't go back.  In fact, they look for additional opportunities to expand***.

124.    The following week, on June 10, 2021, Gaylor gave a presentation on behalf of

DocuSign at the Robert W. Baird Global Consumer, Technology & Services Conference.    In

response to a question as to whether DocuSign was seeing any moderation in consumption patterns

coming out of the pandemic, Gaylor repeated the same claim:

> [Analyst:] [A]s I think about general consumption patterns – and I guess, as you point out, some harder hit industries, where we could see a nice tailwind.  I guess, conversely, are there many pieces where you could see headwinds, I guess, as we come out of the pandemic, where maybe you saw increased usage and already perhaps starting to see any kind of moderation?

\*        \*        \*

[Gaylor:] I think the good news, though, in that is that ***once people move to the platform and they see the value, they're not going to go back and move to pen and paper, right?*** . . . . People are just not – once you see the ease of use and the value in it, not to mention kind of the, it's faster, it's more secure, it's more environmentally friendly, it's easier, there's just a high ROI to doing things electronically versus doing it with pen and paper.

125.    The statements detailed in ¶¶124-126 above were each false or misleading when made for all the same reasons set forth above in ¶¶98(a)-(e), 113(a), and 121(a)-(g), *supra*. Moreover, the additional true facts which were then known to or recklessly disregarded by each of the Individual Defendants at this time include:

(a)    By June 2021, state governments around the country had significantly scaled back or eliminated COVID-19 restrictions and lockdown orders.  FE 3 estimated that 50% of her COVID-19-related accounts churned after the restrictions eased and the pandemic diminished.  Once employees went back to the office, companies did not need as many Envelopes to conduct their business.  Most of her accounts were not renewing or renewing at much lower levels.

(b)    According to Class CW 1, the declining usage trends in product usage and customer renewal rates that she saw in December 2020 and February 2021 were confirmed again between April and June of 2021.

(c)    According to Class CW 13, sales leadership, including Alhadeff, discussed all throughout her tenure that 2021 was an "'unprecedented down year,'" beginning when she joined DocuSign in June 2021.  Such statements were made at team meetings and Alhadeff's statements were made at town halls.

126.    Analyst reports published on June 3 and June 4, 2021, following the 1Q22 earnings call, confirm that the market remained unaware of the true state of DocuSign's waning demand.  For example:

(a)    Piper Sandler reported that its "[c]onfidence continues to improve as eSign demand sustains coming out of the pandemic and longerterm growth vectors remain largely untapped," and that "DOCU is demonstrating early signs of sustained demand, retention and upsell dynamics post-pandemic";

(b)     William Blair repeated its belief that "[w]hile customers in other industries may churn following the pandemic, we do not believe DocuSign will experience any uptick to its normal churn cadence.  In fact, we believe the company could experience larger up-sell opportunities for the agreement cloud over the next few quarters due to the record customer lands it has had over the past year"; and

(c)     Wedbush Securities maintained that "DOCU is in a sweet spot to continue to receive significant customer spending given its unique solution with an e-signature shift that has likely permanently changed among enterprises moving forward (and is not just a WFH pull forward)."

**F.     Defendants Falsely Claimed in September 2021 that They Were Seeing No Difference in Customer Churn**

127.     On September 2, 2021, DocuSign issued a release and convened a conference call to discuss the Company's earnings results for its fiscal quarter ended July 31, 2021 ("2Q22").  During prepared remarks on the 2Q22 conference call, Gaylor repeated the Company's refrain that DocuSign's new business brought on by the pandemic was sustainable over the long term:

> Halfway through fiscal 2022, we have seen customers renewing earlier in the year as they use more envelopes and their purchases catch up with consumption levels.  While we do not expect to maintain the peak levels of growth seen at the height of the pandemic, our value proposition is strong.  ***Regardless of whether people go back to the office, we don't see them going back to pen and paper***.

128.     During the Q&A portion of the call, when asked if they were seeing anything in the business that would justify a more conservative guidance on the Company's billings, Springer maintained that DocuSign would not see a significant slowdown in demand:

> [Analyst:] [I]f we take a look at the metrics, I just want to hear from you – maybe a little bit of more color about the pipeline, about retention rates, particularly in the SMB category.  And if we look at the guidance, the guidance for billings does look incrementally more conservative than you had in the past few quarters.  So I just want to understand, is that cautiousness a sign of something that you're seeing in the business?  Or how would you kind of qualify it?

> *          *          *

> [Springer:] In terms of your question about what's happened in the marketplace, I mean, we feel good.  We feel like we're seeing a lot of demand. We're happy with the new customer adds.  We're happy with the revenue growth. Again, if you asked me a couple of years ago, how I feel about 5 numbers in front of

1      our growth rates and revenue, I feel pretty good.  **_So I don't think there's a_**
2      **_perspective we have that the business has some significant slowdown_**.

                    *     *     *

        But from a standpoint of in the marketplace, **_we're not seeing any differences_**
**_in churn rates in any meaningful way_**.  We're not seeing – **_customers very rarely_**
**_leave us_**.  If we don't do the right job of customer success and adoption, we might
have people where we have some dollar churn.

129.    The following week, on September 8, 2021, Gaylor gave a presentation on behalf of

DocuSign at the Wolfe Research Inaugural TMT Conference.  In response to a question regarding

the durability of DocuSign's pandemic-induced growth, Gaylor again stated that customers would

not go back to pen and paper:

    [Analyst:] [H]opefully are looking over the bridge, so to speak, on the other – to the
other side, how are you thinking about it from a durability – growth durability
perspective.

                    *     *     *

    [Gaylor:] [A]s we look across the landscape and where we're looking to go and
folding in things around the Agreement Cloud, which I'm sure you're going to ask us
about, we think it's just a broader canvas.  And it really plays to kind of this
anywhere economy.  **_Like people are not going to go back to pen and paper once_**
**_they've signed digitally or once they've been able to do agreements and the_**
**_different components of agreements, digitally_**.  And I think that's really a key
differentiator from some of the other market dynamics you're seeing around kind of
the pandemic, in particular.

130.    In response to a question on COVID-19-related onetime use cases, Gaylor maintained

that the majority of customers who signed up for DocuSign during the pandemic had expanded their

use cases:

    [Analyst:] [T]o restate what you're saying is like don't worry so much about the
onetime use cases because a lot of the customers that use DocuSign for those onetime
use cases are now adopting it for other use cases because they've got the trial
effectively, that use case was a trial period and now they're standardizing or scaling
to other much more durable use cases.  Is that the right way to think about it?

    [Gaylor:] Yes, I think that's a good way to think about it.  I might phrase it
even a little bit like to put a finer point on it.  I think we have some customers who
were DocuSign customers using our products, they maybe had onetime use cases and
expanded.  And now part of our job if that use case has gone away to find other
places they could use our products and new use cases or departments that are
developing within their organizations.

    There are, though, just to be clear, there are some customers who came to us
for a specific COVID use case that they no longer have.  And I think it's still TBD,
like what is that next use case or how it will be.  But we would expect to see some

level of churn from those.  But *I would say that's the vast minority versus the majority of the motion*.

131.    The statements detailed in ¶¶129-132 above were each false or misleading when made for all the same reasons set forth above in ¶¶98(a)-(e), 113(a), 121(a)-(g), and 127(a)-(c), *supra*.  Moreover, the additional true facts which were then known to or recklessly disregarded by each of the Individual Defendants at this time include:

(a)    FE 2 ultimately left DocuSign in September 2021 because she started to observe changes with her accounts.  Some of her accounts churned prior to her departure, and she did not have a positive outlook of the prospective market.  In FE 2's view, DocuSign oversold every account they could during the COVID-19 pandemic, and during the pandemic sales representatives were overselling Envelopes.  When contracts came up for renewal a year after the pandemic, companies were signing for less or discontinuing their contracts.

132.    Following the 2Q22 earnings call, numerous analysts published reports on September 2 and September 3, 2021 demonstrating that the market remained convinced of Defendants' false and misleading statements.  For example:

(a)    RBC Capital Markets highlighted that "the quarter demonstrated the sustainability of DOCU's tailwinds post-pandemic";

(b)    UBS Equities stated that "DocuSign posted further evidence that while it benefitted during the pandemic, it has a long tail of sustainable growth"; and

(c)    Morgan Stanley headlined its report by claiming there was "[p]lenty of [g]rowth [l]eft in [t]his [t]ank" and claimed that while the Company was "lapping tougher COVID-driven compares from last year, growth is not going to fall off a cliff."

**G.    Even as the Truth Gradually Emerged in December 2021 and March 2022, Defendants Continued to Deny Reality**

133.    On December 2, 2021, DocuSign issued a release and convened a conference call to discuss the Company's earnings results for its fiscal quarter ended October 31, 2021 ("3Q22").  As further discussed below, the Company's 3Q22 earnings results partially revealed, for the first time, that DocuSign was experiencing dramatically reduced billings growth as a result of decreased

demand for its eSignature products as the economy reopened and customers began returning to pre-pandemic behaviors.  *See infra*, §VII.A.

134.   Nevertheless, during prepared remarks on the 3Q22 conference call, Springer continued to insist that DocuSign's customers would not return to paper as the pandemic subsided:

> Even as the pandemic subsides and people begin to return to the office, ***they are not returning to paper.  eSignature and the broader Agreement Cloud are clearly here to stay***, and DocuSign's value will persist no matter how the future of work unfolds.

135.   The following quarter, on March 10, 2022, DocuSign issued a release and convened a conference call to discuss the Company's earnings results for its fiscal quarter and fiscal year ended January 31, 2022 ("4Q22" and "FY22," respectively).  As further discussed below, the Company's 4Q22 and FY22 earnings results contained further partial disclosures revealing further declines in the Company's billings growth due to waning demand for the Company's eSignature products.  *See infra*, §VII.B.

136.   Despite this, during prepared remarks on the FY22 conference call, Springer continued to repeat the false claim that DocuSign's customers were "not returning to paper" as the pandemic subsided:

> As the pandemic subside and people begin to return to the office, ***they are not returning to paper.  eSignature is clearly here to stay***, and the movement toward the broader Agreement Cloud will only continue to gain prominence.  We are confident we have massive market space to grow.

137.   The statements detailed in ¶¶136 and 138 above were each false or misleading when made for all the same reasons set forth above in ¶¶98(a)-(e), 113(a), 121(a)-(g), 127(a)-(c), and 133(a), *supra*.

## VI.   ADDITIONAL SCIENTER ALLEGATIONS

### A.   The Individual Defendants Had Actual Knowledge of or Recklessly Disregarded DocuSign's Internal Metrics Showing Waning Demand

138.   Defendants' own statements and comments at internal DocuSign meetings confirm that, contrary to their repeated public assurances, they knew that the Company's pandemic-fueled demand was unsustainable:

- According to Class CW 7, Springer told salespeople in all-hands meetings by June 2020 to "'take advantage of this time.'"

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -          - 50

- • According to Class CW 1, Springer also told employees in a June or July 2021 all-hands meeting that DocuSign's stock price was overvalued by "'$50 per share,'" which Class CW 1 understood was due to this COVID-19-related "'blip.'"

- • According to Class CW 13, Alhadeff and other sales leadership discussed all throughout her tenure (beginning in June 2021) that 2021 was an "'unprecedented down year.'"

139.    Defendants also knew or recklessly disregarded red flags of waning demand because they likely received internal reports reflecting alarming key performance metrics (*i.e.*, decreased customer usage and retention rates) by no later than early 2021:

- • According to Class CW 1, she shared reports reflecting declining product usage rates, including the 30% drop in December 2020, and declining renewal rates by February 2021 with senior executives like SVP of Customer Success Lambert Walsh, who then probably sent the reports to Springer.

- • Class CW 4 corroborated such statements, explaining that Walsh reported directly to Springer, and that Walsh likely presented a roll-up of the information that he received at the QBRs to the ELT, which included the CEO and CFO, at regular meetings per "'normal protocol.'"  At a February 2021 QBR, Class CW 4 presented to Walsh and other senior management that DocuSign was exceeding its customer churn numbers and missing consumption (*i.e.*, usage targets) – information that Walsh likely passed along to the ELT.

140.    Former employees also confirm that Defendants also had access to, and continually monitored, these adverse sales and customer trends in the Company's Salesforce and Snowflake databases:

- • According to FE 1, FE 2, FE 3, Class CW 10, and Class CW 13, DocuSign's senior management all had access to the Company's Salesforce database – which, *inter alia*, tracked all accounts and sales information, documented customer usage and churn, and tracked COVID-19-related versus non-COVID-19-related contracts.   FE 1 described Salesforce as the single source of truth on customer sales, and Class CW 10 corroborated that the Company was "'very diligent'" about using Salesforce and Salesforce dashboards to track sales and customer trends.

- • According to Class CW 10, senior management also "'micromanaged'" such sales data in Salesforce as they were concerned about waning demand by February 2021, including during the "'Red Weekend'" example in early 2021 that was a "'top-down'" directive from senior management to update and confirm accurate sales data in the database.

141.    Finally, the accounts from former employees that these demand and customer consumption problems were widely known to senior management are corroborated by Defendants'

own public statements, which also support scienter.  Indeed, Defendants later admitted that – contrary to their prior statements – the dramatic declines in the Company's billings growth were the result of "urgent demand wane" as the COVID-19 pandemic receded and its "onetime use cases" ended.  *See infra*, §VII.B., .C.  Moreover, on quarterly earnings calls with analysts and investors, the Individual Defendants frequently discussed and held themselves out as knowledgeable about DocuSign's key customer demand and sales metrics.  Indeed, Springer, Sheridan, and Gaylor provided updates and/or fielded analyst questions about the sustainability of the Company's COVID-19-driven demand trends on every earnings call during the Relevant Period.  *See supra*, §V. Defendants also repeatedly assured investors that consumer consumption trends were "something that [they] track" and look at "very carefully."  For instance, throughout the Relevant Period, Sheridan and Gaylor repeatedly acknowledged that Defendants closely tracked the Company's "demand data," consumption trends, forecasts, and the "impact of the pandemic" on a granular basis:

- "And so we are endeavoring to stay ahead of the trends that we're seeing.  We're looking at the demand data very carefully to try to forecast the trends and get ahead of that with capacity across the business."  (Sheridan; September 3, 2020 2Q21 earnings call.)

- "[W]hile our subscription-based model gives us a certain level of visibility, the impact of the pandemic adds an extra layer of complexity, which we are monitoring closely."  (Gaylor; March 11, 2021 FY21 earnings call.)

- "We guide to what we can see.  And it's largely data-driven.  So we use everything from pipeline and demand trends to close rates to looking at kind of the net new that we added during the year and looking at kind of the upsell trends and expansion trends within there."  (Gaylor; March 11, 2021 FY21 earnings call.)

- "[Net retention is] a metric that we watch very closely given the consumption trends. And as we talked about the last few quarters, looking at kind of these new cohorts and how they're consuming and how they're expanding and then existing customers and kind of the more historical cohorts.  So we're watching that closely."  (Gaylor; June 3, 2021 1Q22 earnings call.)

- "[W]e do have visibility into customer consumption and how they're using the products, how they're consuming it through the life cycle of their contracts.  So that is something that we track."  (Gaylor; September 2, 2021 2Q22 earnings call.)

142.    The Individual Defendants' admitted "visibility" into "consumer consumption" and "demand data" provided them detailed insight into the Company's waning demand as the COVID-19

1  pandemic subsided, supporting a strong inference that they issued the false and misleading

2  statements alleged above with scienter.  Further, if the Individual Defendants did not have detailed,

3  up-to-date knowledge of these metrics, then they acted recklessly in holding themselves out as

4  knowledgeable about customer demand trends and discussing them in communications with

5  investors.

6  **B. Defendants' Insider Stock Sales and Favorable Debt Offering Further Buttress the Strong Inference of Scienter**

7

8  143.  The Individual Defendants also had substantial financial incentive to commit the

9  fraud alleged herein, as they conducted a massive insider selling spree during the Relevant Period

10  while DocuSign stock traded at artificially inflated prices.  Their Relevant Period insider sales of

11  891,267 DocuSign shares for **over $193 million** in proceeds supports a strong inference that

12  Springer, Gaylor, and Alhadeff timed their respective trading with knowledge of the alleged fraud

13  and sought to capture the stock's artificially inflated trading price before the market could absorb the

14  truth regarding DocuSign's unsustainable COVID-19-driven demand trends.[9]  As demonstrated

15  below and in ***Appendix 1***, the magnitude of their sales is extraordinary – and represented significant

16  proportions of each of their total shares:

| Defendant | Shares Sold | Proceeds | % Sold[10] |
|---|---|---|---|
| Daniel D. Springer | 722,830 | $154,257,495 | 16.8% |
| Cynthia Gaylor | 16,555 | $3,879,127 | 48.7% |
| Loren Alhadeff | 151,882 | $34,951,557 | 32.8% |

---

[9]   The shares sold by Springer and Gaylor were all listed with either an "S" or "F" transaction code on their Forms 4 filed with the SEC.  According to the SEC, transaction "Code S" is used to identify open market sales, whereas "Code F" transactions are those whose proceeds are purportedly used for the "[p]ayment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise or vesting of a security issued in accordance with Rule 16b-3." During the Relevant Period: (a) Springer sold a total of 366,351 shares for $72,407,616 in Code F sales, and 356,79 shares for $81,850,879 in open market sales; and (b) Gaylor sold a total of 10,572 shares for $2,244,135 in Code F sales, and 5,983 shares for $1,634,991 in open market sales.  Even if the proceeds of these Code F transactions legitimately went towards the payment of a stock option exercise price or tax liability, Springer and Gaylor personally profited from transacting in DocuSign stock at artificially inflated prices by tendering fewer shares to cover such liabilities.

[10]   Plaintiffs' conservative estimate of percentage of shares sold includes in the denominator: common stock sold, common stock held, and options and RSUs exercisable within 60 days.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                                    - 53

144.    The amount, nature, and timing of Springer's and Gaylor's insider sales were also dramatically out of line with their prior trading history and were conducted at times to maximize their personal benefit while DocuSign stock traded at record high prices.

145.    In stark contrast to their $81.8 million and $1.6 million in open market sales during the Relevant Period, respectively, neither Springer nor Gaylor made any open market sales during the equivalent pre-Relevant Period interval.  In fact, prior to the Relevant Period, Springer did not make any open market stock sales in DocuSign's entire history as a publicly traded company (*i.e.*, since April 2018), and Gaylor did not have any reported stock sales (Code F or open market) at all.

146.    Springer's and Gaylor's sales were also suspiciously timed.  For instance, Springer's open market sale of more than $81.8 million of stock on February 1, 2021 (9.5% of his holdings) occurred precisely at a time when internal sales data and analyses showed alarming negative demand trends with decreased customer usage and retention rates.  *See* ¶121, *supra*.  This open market sale was also made pursuant to a 10b5-1 trading plan that was adopted on December 8, 2020, after Springer would have already been aware of the internal red flags showing why the Company's COVID-19-related boost was unsustainable, and approximately right around the time when Springer would have learned of adverse internal reports and analysis showing declining customer usage.  *See* ¶113, *supra*.  Similarly, Gaylor's open market sale of more than $1.6 million on November 8, 2021 (25.5% of her holdings) suspiciously occurred less than one month before the Company's first announcement of dramatic declines in billings growth caused DocuSign's stock price to plummet by 42%.  *See* §VII.A., *infra*.  This open market sale from Gaylor was also made pursuant to a 10b5-1 trading plan that was only adopted on October 6, 2021 – well after Defendants were aware of continuous adverse trends in DocuSign's demand metrics.  *See* ¶133, *supra.*

147.    DocuSign itself also took advantage of its artificially inflated share price to raise operating funds in January 2021 on extremely favorable terms.  First, on January 11, 2021, the Company announced the closing of a new $500 million revolving credit facility on favorable terms.  Several days later, on January 15, 2021, DocuSign announced that it had closed the sale of $690 million worth of 0%, unsecured convertible bonds.  These financing transactions, however, occurred

less than a month after Defendants were made aware of the internal analysis showing negative demand trends in declining usage rates from COVID-19-related customers.  *See* ¶113, *supra*.

**C.    The Fraud Involved Demand and Growth Trends for DocuSign's Flagship eSignature Product – *i.e.*, Its Core Operations**

148.    The fraud alleged herein involves the sales operations and prospects of DocuSign's flagship eSignature product, and thus, a strong inference arises that Defendants were aware of, or recklessly disregarded, the true facts contradicting their false and misleading statements.  eSignature is and was the Company's most important product.  In its SEC filings, DocuSign itself described eSignature as its "anchor" product and "core technology platform."  On conference calls and in published analyst reports, the Individual Defendants and market analysts routinely referred to it as the "core eSignature offering" or "core eSignature business."  Indeed, the Company's SEC filings confirm that eSignature accounted for "substantially all" of the Company's revenue during the Relevant Period: "***Sales of subscriptions to [its] e-signature solutions account for substantially all of [its] subscription revenue and are the source of substantially all of [its] professional services revenue***."

149.    Given the critical importance of eSignature to DocuSign's business, and especially in light of the allegations of direct knowledge and admissions of closely tracked data monitoring set forth above (*see* §VI.A., *supra*), it would be absurd to suggest that management was without knowledge of the waning demand for their "flagship" product.

**D.    High-Level Executive Departures and the Reorganization of DocuSign's Leadership Provide Further Evidence of Scienter**

150.    The strong inference of scienter is further bolstered by the fact that three of the Individual Defendants – former CFO Sheridan, former CRO Alhadeff, and former CEO Springer – suddenly departed the Company in successive fashion as the truth of DocuSign's waning demand was revealed to the market in three straight quarterly announcements.

151.    First, on December 2, 2021, DocuSign announced that the employment of former CFO (and then-President, International) Sheridan "ha[d] ended effective November 30, 2021."  This announcement came on the same day that the Company disclosed a dramatic slowdown in its billings growth as customers returned to pre-pandemic buying patterns.  *Infra*, §VII.A.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                          - 55 -

1    152.    Then the following quarter, on March 10, 2022, DocuSign announced that then-CRO

2    Alhadeff had "notified the Company of his intention to resign."  This announcement was made on

3    the same day DocuSign reported another significant drop in its YoY billing rate – to the lowest level

4    the Company had ever seen.  *Infra*, §VII.B.

5    153.    According to a complaint filed by Springer in October 2022 against DocuSign and

6    Chair of the Board Mary Agnes Wilderotter ("Wilderotter"), it was at this time in May 2022 that

7    Wilderotter "began to press . . . Springer to replace key members of the management team" and

8    orchestrate the removal of Springer himself.  *See Springer v. Wilderotter*, No. 2022-0963-LWW

9    (Del. Ch. Oct. 31, 2022).

10   154.    Ultimately, on June 17, 2022 – less than two weeks after DocuSign reported a third

11   consecutive, significant drop in its YoY billings growth (*infra*, §VII.C.) – "Wilderotter told . . .

12   Springer that he was being terminated," and was "adamant that . . . Springer leave immediately."

13   However, in a Form 8-K filed with the SEC on June 22, 2022, which attached a June 21, 2022 press

14   release, the Company announced that it had merely "accepted the resignation" of Springer, and that

15   Springer had "agreed to step aside" from his role as CEO.[11]  Springer has since disputed the

16   Company's characterization of his voluntary departure as CEO.

17   155.    Between June 2022 and October 2022, Springer and the Company negotiated the

18   terms of his separation and over his potential resignation from his remaining position as a member of

19   the Company's Board.  On October 11, 2022, however, the Company unilaterally announced that

20   "the Board [had] accepted the resignation of . . . Springer from the Board" and stated that the

21   resignation was "not due to any disagreement with the Company on any matter related to

22   [DocuSign's] operations, policies or practices."  Springer immediately disputed these assertions, and

23   filed suit against Wilderotter and the Company in the Delaware Court of Chancery seeking

24   declaratory relief that he had indeed not resigned from his position on the Board.  *See* ¶155, *supra*.

25   The Company ultimately stipulated to entry of judgment in favor of Springer, and on January 11,

26

27

28   _____

[11]    That same June 21, 2022 press release also revealed that DocuSign had "accepted the resignation of Scott Olrich, the Company's Chief Operating Officer."

1    2023, the Chancery Court issued an order declaring and confirming that Springer had not resigned

2    from the Board.

3            156.    On January 26, 2023, Springer also delivered a demand for arbitration before JAMS,

4    a private alternative dispute resolution firm, alleging that he was wrongfully terminated from his

5    position as CEO.

6    **VII.    LOSS CAUSATION**

7            157.    The market for DocuSign common stock was open, well-developed, and efficient

8    during the Relevant Period.  Throughout the Relevant Period, DocuSign common stock traded at

9    artificially inflated prices as a direct result of Defendants' materially false and misleading statements

10   and omissions of material fact, which were widely disseminated to the securities market, investment

11   analysts, and the investing public.  Plaintiffs purchased DocuSign common stock relying upon the

12   integrity of the market price of DocuSign common stock and market information relating to

13   DocuSign, and have been damaged thereby.

14           158.    When the relevant truth and its impact on DocuSign's financial results and prospects

15   entered the market through a series of partial disclosures, the price of DocuSign common stock

16   significantly dropped, as the artificial inflation came out of the stock price over time.  As a result of

17   their purchases of DocuSign common stock during the Relevant Period, Plaintiffs suffered economic

18   loss (*i.e.*, damages) under the federal securities laws.

19           159.    The corrective impact of the initial disclosures alleged herein, however, was tempered

20   by Defendants' ongoing misleading statements and omissions that continued to conceal the true

21   nature of Defendants' fraud.  Each partial disclosure did not on its own fully remove the inflation

22   from DocuSign's stock price because it only partially revealed the nature and extent of the fallout

23   from Defendants' previously concealed misconduct.  Defendants' ongoing misrepresentations and

24   omissions maintained the price of DocuSign common stock at artificially inflated levels.

25           160.    The disclosures that corrected the market price of DocuSign common stock are

26   detailed below.  These stock price declines were due to firm-specific, fraud-related disclosures and

27   not the result of market, industry, or firm-specific, non-fraud factors.

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                          - 57 -

1

**A.      December 2021 Loss Event**

2        161.    On December 2, 2021, after the market closed, DocuSign issued a release and

3   convened a conference call for the Company's financial results for the fiscal quarter ended

4   October 31, 2021 (*i.e.*, 3Q22).  DocuSign's 3Q22 earnings release revealed to the market that the

5   Company had undergone a dramatic slowdown in billings growth as "'customers return to more

6   normalized buying patterns, resulting in 28% year-over-year billings growth.'"  This 28% YoY

7   billings growth rate marked the second-lowest billings growth rate that the Company had ever

8   reported as a public company – and was significantly lower than the 59% billings growth rate

9   reported at the start of the Relevant Period and the 47% growth rate reported the prior quarter for

10  2Q22.  In addition, the 3Q22 release also announced that Sheridan – who had served as DocuSign's

11  CFO at the start of the Relevant Period – would be leaving the Company.

12       162.    On the 3Q22 conference call that day, Springer acknowledged that DocuSign had

13  seen "demand slow and the urgency of customers' buying patterns temper," which were "primary

14  contributors" to the drop in billings growth.   And while Springer had previously denied any

15  "significant slowdown" in demand just three months prior on the 2Q22 conference call (¶130,

16  *supra*), he admitted on the 3Q22 call that Defendants had "always expected" decreased demand after

17  the pandemic receded:

18          [W]e always expected there to be a reduction of that really heightened COVID
            buying, which drove our growth rates dramatically higher than they had ever been
19          even as we got bigger.  So we expected that.

20                 I think the piece that we didn't expect are really the other 2 factors.  So the
            one is while we would expect people to sort of return to sort of normalcy in
21          purchasing, we didn't realize that they had been sort of well stocked with DocuSign,
            if you will.  And we saw some of that purchasing behavior where people were, as
22          you said, in that heightened demand model, probably purchasing more aggressively
            than we would have seen in the past.
23
         163.    As shown in the chart below, the price of DocuSign common stock significantly
24
    declined in response to these disclosures, falling $98.73 per share (-42.2%) from the close of trading
25
    on December 2, 2021 to the closing of trading on December 3, 2021, on abnormally high volume, as
26
    compared to a -0.8% decline in the S&P 500.
27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                                          - 58 -

1
2
3
4
5
6
7
8
9
10
11



12    164.    Following DocuSign's disclosures on December 2, 2021, numerous analyst firms

13 published reports on December 2 and 3, 2021, reacting negatively to this news.  For instance:

14    (a)    Piper Sandler downgraded its stock rating to "Neutral" and noted that

15 "Billings of $565M grew 28% y/y, missing our estimate by $32M and the midpoint by -4.4%, the

16 first meaningful billings miss on record as demand dynamics normalized post-pandemic";

17    (b)    BofA Securities lowered its price target on the stock and noted that "[s]lowing

18 demand from reopening drives billings miss," with the "disappointing Q3 result" caused by "billings

19 deceleration and weaker billings outlook";

20    (c)    Citi Research described DocuSign's billings miss as "one of the biggest SaaS

21 whiffs in recent memory";

22    (d)    EverCore lowered its price target on the stock and described the

23 "disappointing F3Q results" as a "Lump Of Coal," "with billings coming in below expectations at

24 +28% vs. guidance of 33-36%";

25    (e)    J.P. Morgan downgraded its stock rating from "Neutral" to "Underweight"

26 and noted that "pandemic tailwinds came to a much faster than expected halt for DocuSign";

27    (f)    RBC Capital Markets lowered its price target on the stock, pointing out that

28 the "[b]illings growth of 28% Y/Y decelerated 19 points from last quarter"; and

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 59

(g)     Wedbush Securities downgraded its stock rating from "Outperform" to "Neutral," as"[l]ast night was a debacle quarter from DOCU."

165.    Nevertheless, the price of DocuSign common stock remained artificially inflated as Defendants continued to mislead the market (¶136, *supra*), causing the stock to continue to trade at artificially inflated prices.

**B.    March 2022 Loss Event**

166.    On March 10, 2022, after the market closed, DocuSign issued a release and convened a conference call for the Company's financial results for the fiscal quarter and year ended January 31, 2022 (*i.e.*, 4Q22 and FY22).  DocuSign's 4Q22 earnings release disclosed that the Company's YoY billings growth rate had dropped yet again to only 25% that quarter – the lowest YoY billings growth rate it had ever reported in its life as a public company.  The 4Q22 earnings release also issued lower than expected billings guidance for fiscal year 2023 ranging between $2.71 billion and $2.73 billion, and announced (then CRO) Alhadeff's resignation from the Company.

167.    On the 4Q22 earnings call, Springer acknowledged that these disappointing results were the result of further waning demand:

> In the second half of the year, there were more challenging macro conditions impacting our customers' priorities.  We saw a diminished level of urgency in their buying patterns . . . .  As we saw urgent demand wane, we have just begun to shift in our sales motion, back to a demand generation mode of cross-sell, upsell and departmental expansion.

168.    As shown in the chart below, the price of DocuSign common stock significantly declined in response to these disclosures, falling $18.87 per share (-20.1%) %) from the close of trading on March 10, 2022 to the closing of trading on March 11, 2022, on abnormally high volume, as compared to a -1.3% decline in the S&P 500.



169.     Following DocuSign's disclosures on March 10, 2022, numerous analyst firms published reports on March 10 and 11, 2022, reacting negatively to this news.  For instance:

(a)     Piper Sandler headlined its report by acknowledging that "Growth Rates Continue to Decline in Forward Outlook," and noted that "meaningful top-line deceleration and lowered growth outlook for F'23 adds to the elevated risk profile after a miss last Q";

(b)     RBC Capital Markets described the results as "Another Swing-and-Miss Quarter" as "[b]oth revenue / billings guidance missed consensus by a wide margin" and "[b]illings growth was 25% Y/Y, decelerating again," and not that it was "hard not to be disappointed in DOCU's quarter and outlook";

(c)     Wells Fargo Securities lowered its price target and noted that the Company's "FY23 outlook for ~16%/18% billings/revenue growth" was "disappointing given prior commentary from the company around confidence in the business' ability to sustain pre-pandemic growth rates even as the demand environment normalizes," and that the FY23 billings guidance was "well below our/consensus expectation of ~26% y/y"; and

(d)     Wedbush Securities stated that "the demise of the DocuSign growth story continued as the [work-from-home] poster child delivered good January results which were more than offset by very weak and concerning guidance which speaks to some darker days ahead."

170.    However, the price of DocuSign common stock remained artificially inflated as Defendants continued to issue false and misleading statements to the market (¶138, *supra*), and the full impact of their prior misrepresentations on the stock price was not fully revealed until the following quarter.

**C.      June 2022 Loss Event**

171.    On June 9, 2022, after the market closed, DocuSign issued a release and convened a conference call for the Company's financial results for the fiscal quarter ended April 30, 2022 (*i.e.*, the first quarter of fiscal year 2023 ("1Q23")).  DocuSign's 1Q23 earnings release disclosed a third consecutive quarter of decelerating billings growth, as the YoY billings growth rate declined to just 16% for the quarter – the lowest it had ever reported as a public company.  The 1Q23 earnings release also lowered billings guidance for the following quarter by approximately $200 million.

172.    On the 1Q23 earnings call, Springer again acknowledged that the shrinking billings growth and lowered billings guidance were the result of waning pandemic demand: "I think we believe the larger impact for us is coming off the sort of very aggressive buying that we had during COVID."  Springer further acknowledged later in the call that the "dramatic" demand acceleration caused by the pandemic was the result of one-off use cases:

> I would agree with the assessment that initially, probably underestimated, I underestimated sort of the impact in the post-COVID sort of demand acceleration and maybe how dramatic that was.  Clearly, we saw that the business growth rate practically doubled, and we doubled the size of the company in sort of like 6, 7 quarters.  So it wasn't that we were not aware of the dramatic economics of it.  I think we just didn't understand what portion of that would be things like onetime use cases or an acceleration where people bought in a more fulsome way.

173.    As shown in the chart below, the price of DocuSign common stock significantly declined in response to these disclosures, falling $21.43 per share (-24.5%) from the close of trading on June 9, 2022 to the close of trading on June 10, 2022, on abnormally high volume, as compared to a -2.9% decline in the S&P 500.  The stock price continued its sharp decline on the next trading day,

falling another $6.81 per share (-10.3%) from the close of trading on June 10, 2022 to the close of trading on June 13, 2022, on high volume, as compare to a -3.9% decline in the S&P 500.



174.    Following DocuSign's disclosures on June 9, 2022, numerous analyst firms published reports on June 9 and 10, 2022, reacting negatively to this news.  For instance:

(a)    Piper Sandler noted that "another meaningful reduction in billings guidance for F'23 and growing uncertainty around timing of potential reacceleration add to the risk profile";

(b)    RBC Capital Markets described the "disappointing F1Q23, with a cut in FY billings guidance being the headline," as being the result of "customers who bought aggressively during COVID (i.e., financial, public sector) pulled forward demand, translating to smaller upsells, and in some cases for one-time use cases (e.g., PPV loans)";

(c)    Morgan Stanley headlined the results as a "Storm Continu[ing] to Form" as the Company experienced "[h]eadwinds from post-covid demand normalization . . . weighed on reduced FY23 billings growth guidance";

1    (d)    Wedbush Securities framed the results as DocuSign "deliver[ing] yet another

2    disappointing quarter as the company once again lowered billings guidance," as they "believe[d] that

3    the end of DOCU's core growth story is now essentially over with the clock striking midnight

4    following a billings guidance drop of ~$200 million pointing to an uncertain future for the remainder

5    of FY23"; and

6    (e)    William Blair downgraded the stock "to Market Perform following weaker-

7    than expected billings guidance for fiscal 2023."

8    **VIII.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE**

9    175.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-

10    on-the-market doctrine in that:

11    • Defendants made public misrepresentations or failed to disclose material facts during
          the Relevant Period;

13    • the misrepresentations and omissions were material;

14    • DocuSign common stock traded in an efficient market;

15    • the Company's common stock is liquid and was heavily traded during the Relevant
          Period;

17    • the Company's common stock traded on the NASDAQ and was covered by multiple
          analysts; and

19    • Plaintiffs purchased DocuSign common stock between the time Defendants
          misrepresented or failed to disclose material facts and the time the true facts were
          disclosed, without knowledge of the misrepresented or omitted facts.

21    176.    Based upon the foregoing, Plaintiffs are entitled to a presumption of reliance upon the

    integrity of the market.

23    177.    Plaintiffs are also entitled to the presumption of reliance established by the Supreme

    Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as Defendants omitted

    material information in their Relevant Period statements in violation of a duty to disclose such

    information, as detailed above.

**COUNT I**

**For Violation of §10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

178.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

179.   This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder, and is brought against all Defendants.

180.   Pursuant to the above wrongful course of conduct, Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other documents described above, such as statements made to securities analysts and the media that were designed to influence the market for DocuSign common stock.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about DocuSign's finances and business prospects.

181.   By virtue of their ownership and/or positions at DocuSign, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the market, or, in the alternative, the Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the false and misleading nature of the statements made, although such facts were readily available to the Individual Defendants.  Said acts and omissions were committed willfully or with reckless disregard for the truth.

182.   Information showing that the Individual Defendants acted knowingly or with reckless disregard for the truth is peculiarly within their knowledge and control.  As executive officers of DocuSign, the Individual Defendants had knowledge of the details of DocuSign's internal affairs.

183.   Defendants are directly and indirectly liable for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of DocuSign.  As officers of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful

1    information with respect to DocuSign's businesses, operations, future financial condition, and future

2    prospects.  As a result of Defendants' misconduct, the market price of DocuSign common stock was

3    artificially inflated throughout the Relevant Period.  Unaware of the adverse facts concerning

4    DocuSign's business and financial condition that were concealed by Defendants, Plaintiffs

5    purchased DocuSign common stock at artificially inflated prices and in doing so relied upon the

6    price of the common stock, the integrity of the market for the common stock, and/or upon statements

7    disseminated by Defendants, and were damaged thereby.

8           184.    During the Relevant Period, DocuSign common stock was traded on an active and

9    efficient market.  Plaintiffs, relying upon the integrity of the market, purchased DocuSign common

10   stock at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs known the truth,

11   they would not have purchased said DocuSign common stock, or would not have purchased them at

12   the inflated prices paid.  At the time of the purchases and/or acquisitions by Plaintiffs, the true value

13   of DocuSign common stock was substantially lower than the prices paid by Plaintiffs.  The market

14   price of DocuSign common stock declined upon public disclosure of the facts alleged herein to the

15   injury of Plaintiffs.

16          185.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly

17   or indirectly, have violated §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5

18   promulgated thereunder.

19          186.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered

20   damages in connection with their respective purchases, acquisitions, and/or sales of DocuSign

21   common stock during the Relevant Period, as the truth about DocuSign's operations and prospects

22   began to be disclosed to the investing public.

23

24

25

26

27

28

**COUNT II**

**For Violation of §20(a) of the Exchange Act**
**Against All Defendants**

187.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

188.    This Count is based upon §20(a) of the Exchange Act, 15 U.S.C. §78t(a), and is brought against all Defendants.

189.    During the Relevant Period, the Individual Defendants participated in and oversaw the operation and management of DocuSign, and conducted and participated, directly and indirectly, in the conduct of DocuSign's business affairs.  The Individual Defendants exercised control over DocuSign's operations and possessed the power to control, and did control, the specific activities which comprise the primary violations about which Plaintiffs complain.

190.    The Individual Defendants acted as controlling persons of DocuSign within the meaning of §20(a) of the Exchange Act.  By virtue of their senior management positions as officers and/or directors of DocuSign, their participation in and awareness of the Company's operations, and their personal knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these defendants had the power to influence and control and did influence and control, directly or indirectly, DocuSign's decision-making, including the content and dissemination of the allegedly false and misleading statements and other acts in furtherance of a fraudulent scheme.

191.    In particular, each of the Individual Defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular business and/or operating practices and expenditures and deficient control environment giving rise to the securities violations alleged in Count I, and exercised that power.

192.    DocuSign had the power to control and influence the Individual Defendants and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment

considerations.  By virtue of the foregoing, DocuSign had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Individual Defendants including the content of their public statements.

193.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases and/or acquisitions of DocuSign common stock during the Relevant Period when the relevant truth was revealed.

194.    By reason of the foregoing, the Defendants in this Count violated §20(a) of the Exchange Act.

**COUNT III**

**For Violation of §20A of the Exchange Act**
**Against Defendants Springer, Gaylor, and Alhadeff**

195.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

196.    This Count is based upon §20A of the Exchange Act, 15 U.S.C. §78t-1, and is brought against defendants Springer, Gaylor, and Alhadeff on behalf of Plaintiffs who were damaged by these defendants' insider trading.

197.    As detailed herein, defendants Springer, Gaylor, and Alhadeff were in possession of material, nonpublic information concerning DocuSign.  They took advantage of their possession of material, nonpublic information regarding DocuSign to obtain millions of dollars in insider trading profits during the Relevant Period.

198.    As set forth in ***Appendix 2***, these defendants' sales of DocuSign shares were made contemporaneously with (*i.e.* within nine days of) Plaintiffs' purchases of DocuSign shares during the Relevant Period.  *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 606 (N.D. Cal. 2019) (finding "contemporaneous" element of §20A claim adequately pled where plaintiff alleged trading gap of nine days); *Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*, 2021 WL 1056549, at *8 (N.D. Cal. Mar. 19, 2021) (same); *City of Westland Police & Fire Ret. Sys. v. Sonic Sols.*, 2009 WL 942182, at *12 (N.D. Cal. Apr. 6, 2009) (same).

1   199.   Plaintiffs who purchased shares of DocuSign shares contemporaneously with sales by

2   these defendants suffered damages because: (i) in reliance on the integrity of the market, they paid

3   artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as

4   alleged herein; and (ii) they would not have purchased DocuSign common stock at the prices they

5   paid, or at all, if they had been aware that the market prices had been artificially inflated by the

6   misconduct alleged herein.

7   **PRAYER FOR RELIEF**

8   WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

9   A.   Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly

10   and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be

11   proven at trial, including interest thereon;

12   B.   Awarding Plaintiffs their reasonable costs and expenses incurred in this action,

13   including reasonable attorneys' fees, accountants' fees, and experts' fees, and other costs and

14   disbursements; and

15   C.   Awarding Plaintiffs such other injunctive or equitable relief, including disgorgement

16   and/or the imposition of a constructive trust, that may be deemed just and proper by the Court.

17   **JURY DEMAND**

18   Plaintiffs hereby demand a trial by jury.

19   DATED:  September 25, 2024

ROBBINS GELLER RUDMAN
& DOWD LLP
20   DARREN J. ROBBINS
A. RICK ATWOOD, JR.
21   LUKE O. BROOKS
J. MARCO JANOSKI GRAY
22

23

_s/ Luke O. Brooks_
24   LUKE O. BROOKS

25   655 West Broadway, Suite 1900
San Diego, CA  92101-8498
26   Telephone:  619/231-1058
darrenr@rgrdlaw.com
27   ricka@rgrdlaw.com
lbrooks@rgrdlaw.com
28   mjanoski@rgrdlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
shawnw@rgrdlaw.com

Attorneys for Plaintiffs